United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 20, 2007**

Charles R. Fulbruge III
Clerk

REVISED April 3, 2007
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 06-10267

DARRY L. BURRELL,

Plaintiff-Appellant,

VERSUS

DR PEPPER/SEVEN UP BOTTLING GROUP, INC.; DR PEPPER/SEVEN UP
BOTTLING GROUP, L.P.

Defendants-Appellees

Appeal from the United States District Court
For the Northern District of Texas, Dallas Division

Before DAVIS and STEWART, Circuit Judges, and GODBEY[*], District Judge.

W. EUGENE DAVIS, Circuit Judge:

Darry L. Burrell ("Burrell") appeals the dismissal on summary
judgment of his employment discrimination and retaliation claims
against defendant Dr. Pepper/Seven Up Bottling Group, L.P. ("Dr.

_____

[*]District Judge of the Northern District of Texas, sitting
by designation.

-1-

Pepper"). We AFFIRM in part and VACATE and REMAND in part.

I.

Burrell, an African-American male, began his employment with Dr. Pepper as the Corporate Purchasing Manager in May 2001. Burrell initially worked under Penny Soriano ("Soriano"), Dr. Pepper's Vice President of Purchasing, to centralize and manage national purchasing for Dr. Pepper. Burrell's responsibilities included assisting in both the negotiation and management of various term contracts with Dr. Pepper suppliers.

In May 2002, Soriano resigned and recommended that Burrell be hired to replace her as Vice President of Purchasing. Burrell spoke with Tom Taszarek ("Taszarek"), Executive Vice President of Administration, expressing his interest in being promoted to the vacant position. Ultimately, however, Dr. Pepper did not promote Burrell and instead sought a replacement from outside the company. The parties dispute the reason given by Dr. Pepper for its decision not to promote Burrell. Burrell alleges that Dr. Pepper told him that it wanted to hire someone with more "purchasing experience." On the other hand, Dr. Pepper states "purchasing experience in the bottling industry" was the relevant criteria. In June 2002, Burrell suggested to Taszarek that his failure to be promoted was actually the result of racial discrimination and he gave Taszarek a copy of the book <u>Roberts v. Texaco: A True Story of Race and Corporate America</u>. Burrell told Taszarek that his treatment at Dr. Pepper was analogous to the experience of the plaintiff employee in

-2-

the litigation detailed by the book.

In October 2002, Dr. Pepper hired Ted Koester ("Koester"), a white male, to fill the vacant position of Vice President of Purchasing.  Immediately preceding his arrival at Dr. Pepper, Koester served as the Logistics Manager for a Coca-Cola distribution center in San Antonio.  He held that position for approximately two years, but had been at Coca-Cola for 13 years.  According to his resume, Koester, as Logistics Manager, was responsible for the management of a 27 million case distribution center with a direct staff of 99 people.  In addition, Koester had experience in the negotiation of contracts with carriers and the purchasing of production/warehouse materials.  In his deposition, Koester explained that one such contract was valued at near 30 million dollars.

Although Burrell was not promoted to the position of Vice President of Purchasing, the parties agree that he took on many duties associated with the position after the departure of Soriano in May 2002, through Koester's hiring in October 2002, and continuing into February 2003 while Koester became familiar with the company and his new job.  Burrell reported directly to CEO Jim Turner ("Turner") during this time and aided in the company's purchasing functions.  Dr. Pepper concedes that Burrell got high marks for his work during this transition period.  Burrell received a salary increase and also received a bonus in February 2003 for his performance.  In addition, Burrell was selected in March 2003

to attend an annual company trip designated for high performing employees.

Despite these positive performance indicators, Burrell and Koester clashed, almost from the beginning of Koester's employment. During their first telephone conversation in October of 2002 (just after Koester was hired), Burrell says he became concerned about Koester's qualifications when Koester allegedly admitted to him that he had no purchasing experience and that Burrell would have to teach him purchasing. During that same conversation, Burrell says he became offended when Koester stated that he had no qualms about firing employees and would even fire his own mother; in response, Burrell hung up on Koester. Later that month, Burrell claims that Koester attempted to tell him a racist joke. In addition, around the same time, Koester allegedly told Burrell that there was something about Burrell that intimidated him. For his part, Koester alleges that Burrell engaged in various insubordinate acts during this period including failing to submit weekly reports and vacation requests as well as refusing to complete an assigned project.

These exchanges prompted several meetings between Burrell and Taszarek in which Burrell would complain about Koester's behavior and lack of qualifications. In one meeting with Taszarek, in the Spring of 2003, Burrell compared his situation to that of class action litigants who had alleged racial discrimination against Coca-Cola. Burrell gave Taszarek copies of two magazine articles

-4-

that detailed the lawsuit.

The conflict accelerated in July 2003 when Koester gave Burrell a negative performance review. The report rated Burrell as marginal and unsatisfactory (the two lowest ratings) in five of six categories of performance. Burrell requested and was granted permission to respond in writing to the evaluation and he delivered his written response (with copies to the CEO Turner and Taszarek) on August 4, 2003. Burrell's response characterized Koester's evaluation as a "completely inappropriate and unprofessional attack on [his] character" and went on to dispute the accuracy of the evaluation through three pages of supporting facts. Further, Burrell questioned Koester's ability to give an accurate evaluation for the previous year since Koester had not arrived until October 2002 and, even then, Burrell continued reporting directly to the CEO until February 2003. On the same day that Burrell's response was delivered and after consultation between Taszarek and Turner, Dr. Pepper terminated Burrell's employment.

After refusing a conditional severance package, Burrell filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") over Dr. Pepper's failure to promote him and his subsequent termination. After receiving a right-to-sue letter from the EEOC, Burrell filed suit in district court for (1) unlawful discrimination for refusal to promote, (2) unlawful discrimination for termination based upon race, and (3) unlawful retaliation for termination based upon

previous complaints of race discrimination.

Dr. Pepper moved for summary judgment. In support, Dr. Pepper asserted that Burrell had failed to sufficiently refute its legitimate, non-discriminatory reason for hiring Koester rather than promoting Burrell: Koester's greater experience in bottling. On the claims related to Burrell's termination, Dr. Pepper alleged that the termination was because of insubordination, and specifically cited (1) Burrell's failure to turn in weekly reports and vacation requests to Koester; (2) Burrell's complaints about Koester's qualifications; (3) Burrell's refusal to research possible cost and supplier reductions in regards to a company project; and (4) Burrell's written response to Koester's evaluation.

The district court granted Dr. Pepper's motion for summary judgment, dismissing all of Burrell's claims. On the failure to promote claim, the district court held that Burrell could not demonstrate that Dr. Pepper's reason was a pretext for discrimination because the evidence did not establish that he was "clearly more qualified" than Koester. On the termination claims, the district court held that Burrell had not raised a genuine issue of fact on the legitimacy of Dr. Pepper's proffered reason for his termination, namely, insubordination.

## II.

We review the district court's grant of summary judgment <u>de</u>

-6-

<u>novo</u>.[1]  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party.[3]  A fact issue is "material" if its resolution could affect the outcome of the action.[4]  We construe all facts and inferences in the light most favorable to the non-moving party when reviewing a summary judgment.[5]

## III.

A claim of employment discrimination can be proven through direct or circumstantial evidence.[6]  Where, as here, the plaintiff does not produce any direct evidence of discrimination, we apply the well-known <u>McDonnell-Douglas</u> burden-shifting framework as

---

[1]<u>Jones v. Comm'r</u>, 338 F.3d 463, 466 (5th Cir. 2003).

[2]Fed. R. Civ. P. 56(c).

[3]<u>Hamilton v. Segue Software Inc.</u>, 232 F.3d 473, 477 (5th Cir. 2000).

[4]<u>Id.</u>

[5]<u>Cooper Tire & Rubber Co. v. Farese</u>, 423 F.3d 446, 454 (5th Cir. 2005) (internal quotation and citation omitted).

[6]<u>Wallace v. Methodist Hosp. Sys.</u>, 271 F.3d 212, 219 (5th Cir. 2001).

modified and restated by this court.[7]

Under the modified <u>McDonnell-Douglas</u> approach, the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic.[8]

### A.

Dr. Pepper concedes that Burrell has established his prima facie case on his failure to promote claim: (1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position.[9]

Dr. Pepper responds to Burrell's prima facie case with a legitimate, nondiscriminatory reason for not promoting Burrell to

---

[7]<u>See</u> <u>Rachid v. Jack In The Box, Inc.</u>, 376 F.3d 305, 312 (5th Cir. 2004) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

[8]<u>Id.</u>

[9]<u>See</u> <u>Medina v. Ramsey Steel Co., Inc.</u>, 238 F.3d 674, 680-81 (5th Cir. 2001).

-8-

the Vice President of Purchasing Position: Dr. Pepper desired someone with more "purchasing experience in the bottling industry."

Burrell has two methods available to him to try to prove that Dr. Pepper's proffered reason for failing to promote him was a pretext for racial discrimination: (1) Burrell could show that Dr. Pepper's proffered explanation is false or "unworthy of credence";[10] or (2) Burrell could try to prove that he is "clearly better qualified" than the person selected for the position.[11]

We first consider whether Burrell produced sufficient evidence to demonstrate that Dr. Pepper's proffered rationale for its employment decision is false. An employer's explanation is false or unworthy of credence if it is not the real reason for the employment action.[12]

Burrell attempts to demonstrate the falsity of Dr. Pepper's experience rationale primarily by comparing his relevant purchasing experience with that of Koester. Specifically, Burrell cites his

_____

[10]Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003).

[11]Celestine v. Petroleos de Venzella SA, 266 F.3d 343, 356-57 (5th Cir. 2001). The district court only assessed whether Burrell had established that he was "clearly better qualified" than Koester. While a showing that a plaintiff is "clearly better qualified" is one way of demonstrating that the employer's explanation is a pretext, it is not the only way. Pretext may be shown by any evidence which demonstrate's the employer's proffered reason is false. See, e.g., Gee v. Principi, 287 F.3d 342, 347-48 (5th Cir. 2002) (an employer's inconsistent explanations for its employment decisions at different times permits a jury to infer that the employer's proffered reasons are pretextual).

[12]Laxton, 333 F.3d at 578.

role as the Corporate Purchasing Manager under Penny Soriano as well as his increased responsibilities during the period of time after her departure and continuing into the first several months of Koester's tenure as comprising nearly two years of relevant "purchasing experience in the bottling industry." Burrell notes that, in addition to the length of his service, the strength of his experience is demonstrated by the special recognition he received through increases in pay and his invitation on the company trip. Burrell argues that Koester's experience at the time of the hiring decision was far less extensive than his, a fact he believes is established by the depositions of Taszarek and Koester. Burrell argues that evidence of his strong background in purchasing and Koester's relatively weak background, along with his exemplary performance of the Vice President of Purchasing duties during Koester's initial months of employment, supports the conclusion that Dr. Pepper did not seek someone with more "purchasing experience in the bottling industry."

Burrell also attempts to demonstrate the falsity of Dr. Pepper's rationale by arguing that Dr. Pepper's explanation for its employment decision has failed to remain consistent. He notes that initially, in Dr. Pepper's letter to the EEOC, it asserted that Burrell was passed over based on his lack of "purchasing experience," but that in its motion for summary judgment below, Dr. Pepper asserted that Koester's greater "bottling experience" was the reason Burrell was not promoted. Burrell argues that neither

of these rationales matches Dr. Pepper's explanation to this court, that Koester was selected over Burrell because he had more "purchasing experience in the bottling industry."

Dr. Pepper characterizes the evidence differently. The company states that, far from representing significant purchasing experience, Burrell's duties during the period immediately before and after Koester's hiring can best be characterized as that of a functionary, responsible only for information collection. Burrell's assistance in contract negotiations being conducted by CEO Jim Turner, Dr. Pepper continues, did not actually constitute hands-on negotiation and purchasing of raw materials and supplies which it expected the Vice President of Purchasing to perform. On Koester's experience, the company argues that Koester's 13 years with Coca-Cola and his most recent two years of management experience in supply chain system and procurement procedures were all valuable experience in taking over purchasing for Dr. Pepper. Dr. Pepper points out, for instance, that one obvious benefit of this experience was Koester's relationships with a large number of Dr. Pepper's suppliers. In addition, Dr. Pepper cites Koester's deposition testimony, establishing his purchase of over $30 million in equipment while at Coca-Cola, as evidence of his qualification for the Vice President of Purchasing position.

Dr. Pepper also attempts to reconcile the apparent inconsistencies between the explanations for not promoting Burrell it offered to the EEOC ("purchasing experience") and to this court

("purchasing experience in the bottling industry") by describing the second statement as a mere clarification of the type of purchasing experience that Dr. Pepper felt was important.

Having considered these arguments, and after our own independent review of the record, we conclude that a genuine issue of material fact remains regarding whether Dr. Pepper's hiring decision was based on purchasing experience in the bottling industry.

Despite Dr. Pepper's evidence of Koester's long service with its top competitor, it is clear that the bulk of his experience was not in the negotiation of contracts and purchasing raw materials and supplies, but rather in management and operations. Koester's own resume and deposition testimony indicates that he lacked significant purchasing experience in the bottling industry. For instance, while at one point listing contract negotiation as one of his duties as Logistics Manager, Koester's resume offered no specific instance of contract negotiation in the 13 bullet pointed highlights of his accomplishments at Coca-Cola. The resume notably omits mention of the $30 million in purchasing which Koester asserted in his deposition. However, even accepting the $30 million claim at face value, Koester conceded that this did not necessarily qualify him to handle Dr. Pepper's purchasing operation, since that budget approached "north of $750 million" which made "quite a bit of difference." In addition, while Koester had a relationship with a large number of Dr. Pepper's suppliers,

-12-

this apparent strength arguably applied just as strongly, if not more so, to Burrell's case for the promotion, since Burrell presumably had working relationships with all of Dr. Pepper's current suppliers.

Most significantly, the testimony of Taszarek, the man who ultimately hired Koester, permits the inference that Dr. Pepper was aware that Koester had less purchasing experience in the bottling industry than Burrell. For instance, at one point in his testimony, Taszarek admitted that Burrell had more relevant purchasing experience than Koester.[13] He also acknowledged that Koester's "main experience was[] in distribution and warehousing" and not in purchasing for product lines or negotiation of product prices.[14] Taszarek further conceded that, as a logistics manager, Koester probably would not have been involved in the negotiation of

---

[13]Q: Would you agree that Mr. Burrell had more purchasing experience in the purchasing department than Mr. Koester did?
    A: Indirectly, yes. I mean, I guess what he had done before, as far as sitting at a desk and placing orders and coordinating purchases, yeah, I would say he had more of that.

    . . . .

    A: Yeah, I would say he had done more of what I would call purchasing, straight ahead purchasing.

[14]Q: Right. But is that what you understood Mr. Koester's main experience was, in distribution and warehousing?
    A: I guess so. If I understand the question right, yeah.
    Q: Okay.
    A: In other words, he was not running production lines.
    Q. Right.
    A: Correct.
    Q: And he wasn't purchasing for production lines?
    A: I don't believe he was doing that much of it, no. No.

contracts.[15]

It is also clear that Burrell's duties at Dr. Pepper as a Manager and then as a stopgap Vice President of Purchasing gave him significant purchasing experience by the time Koester was hired. A reasonable jury would be entitled to reject Dr. Pepper's efforts to minimize Burrell's responsibilities from May 2002 until February 2003 as not comprising significant or relevant purchasing experience. Taszarek explained that it was the ultimate duty of the Vice President of Purchasing and his staff to "collect[] all the information so that the CEO can make the appropriate decision" on purchasing contracts. Taszarek stated that Burrell excelled in exactly this function, i.e., summarizing different proposals and contacting the suppliers on behalf of CEO Turner.[16] He further conceded that Koester had never done the type of information gathering that the CEO of a company relies on in order to negotiate

---

[15]Q: All right. But the logistics person hasn't negotiated the contracts?
A: No, huh-uh.
Q: And purchased it to make sure that it's available to be there, correct?
A: No. He orders it. The logistics person orders the product. The price of the product was negotiated somewhere else.

[16]Taszarek stated in his deposition: "[W]hen Penny left, then we got into an end-of-year renegotiation, you know, renegotiation of some major contracts we had. Darry did a great job of picking up the slack, and these negotiations are – obviously, all the decisions are made by the CEO, but he needs a lot of input on – as far as summarizing different proposals and contact with the suppliers, and I remember he gave it a great effort, and Mr. Turner was very pleased with his efforts."

contracts.  In addition, Burrell produced a memorandum he wrote to Turner reporting on his activities during a several week period. In the January 17, 2003 memo, Burrell described the results of negotiations which he had conducted without Turner's participation and in which he and another Dr. Pepper employee decided to award several business contracts.  Further, while taking issue with certain aspects of Burrell's performance, Koester's performance review of Burrell also indicates that Burrell was responsible for "negotiating with suppliers" and for "ensuring [Dr. Pepper receives] the best combination of price, quality and service."

In addition to evidence on Koester and Burrell's qualifications, Dr. Pepper's rationale for its hiring decision is also suspect because it has not remained the same.  While Dr. Pepper offers an explanation for the difference between the reason for promoting Koester over Burrell it offered to the EEOC ("purchasing experience") and the one offered to this court ("purchasing experience in the bottling industry"), its brief does not attempt to explain how either explanation is consistent with its arguments to the district court which were framed in terms of Burrell's insufficient "bottling" experience.  This unexplained inconsistency was further evidence from which a jury could infer that Dr. Pepper's proffered rationale is pretextual.[17]

---

[17]See Gee, 289 F.3d at 347-48 (determining summary judgment was improper where the plaintiff produced evidence that the employer's explanation for her non-selection had been inconsistent).

Given the summary judgment evidence discussed above, a reasonable jury could conclude that Koester's experience did not exceed Burrell's and that Dr. Pepper was aware of this fact. It follows that a reasonable factfinder could conclude that Dr. Pepper's asserted justification for hiring Koester (his greater purchasing experience in the bottling industry) is "unworthy of credence" and a pretext for intentional discrimination.[18]

As the Supreme Court explained in Reeves v. Sanderson Plumbing Prods., Inc.:

> the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt.[19]

The Reeves Court went on to state that there may be rare instances in which a showing of pretext is insufficient to sustain a jury's finding on discrimination, such as when: (1) the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or (2) the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there is abundant uncontroverted evidence that no discrimination

---

[18]Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

[19]Reeves, 530 U.S. at 147 (internal quotation marks and citations omitted).

occurred.[20]

Dr. Pepper offers no other nondiscriminatory reason for the employment decision nor does the record present uncontroverted evidence that no discrimination occurred. Accordingly, on this record, a jury could conclude that Dr. Pepper's proffered reason for failing to promote Burrell is false and that intentional discrimination was the real motive.[21] Summary judgment was therefore inappropriate.[22]

B.

Burrell also asserts that his termination was either the product of discrimination on account of his race or retaliation for his complaints of racial discrimination.

Assuming Burrell can establish a prima facie case on both counts, Burrell acknowledges that Dr. Pepper has come forth with a legitimate, non-discriminatory reason for his termination: his on-the-job insubordination. As stated above, Dr. Pepper cited the following specific instances of insubordination: (1) Burrell's failure to turn in weekly reports and vacation requests to Koester;

---

[20]Id. at 148.

[21]See Laxton, 333 F.3d at 585 (where plaintiff had made out both a prima facie case and a sufficient showing of pretext, and where none of the rare circumstances identified in Reeves applied, plaintiff had produced sufficient evidence to withstand a motion for judgment as a matter of law).

[22]Because we resolve Burrell's claim on the above ground, we need not consider whether Burrell established that he was "clearly more qualified."

-17-

(2) Burrell's complaints about Koester's qualifications; (3) Burrell's refusal to research possible cost and supplier reductions in regards to a company project; and (4) Burrell's written response to Koester's evaluation. The record reflects that the dispute over the weekly reports and the unchallenged allegation that Burrell would often complain about Koester's qualifications were issues which probably contributed to the strained relationship between the men. However, given that Burrell was fired on the day his evaluation response was delivered, the parties focus primarily on Burrell's response to Koester's negative evaluation as the primary reason for the termination.

Burrell asserts that Dr. Pepper's decision to terminate his employment based on the evaluation response is a pretext for discriminatory intent, however, he offers little in the way of record evidence in support of this view. As detailed above, the performance evaluation response authored by Burrell begins by characterizing Koester's initial evaluation as an inappropriate and unprofessional attack and questions Koester's ability to give an accurate evaluation. The response goes on to attribute the negative review to Koester's "biased perception" of Burrell's on-the-job performance. Throughout his response, Burrell accuses Koester of being ill informed and unqualified to critique his performance.

While the response includes significant supporting facts and examples, Burrell made clear his lack of respect for Koester's

-18-

authority, asserted no responsibility for their bad relationship, and made no provisions for future changes. Both the evaluation and the response demonstrate the failed working relationship between Burrell and Koester. Notably, neither document contains any mention of a racial or retaliatory basis for their disagreements. Burrell's brief unpersuasively suggests that Dr. Pepper set up Burrell with a false and negative performance review in order to provide a reason to terminate him. However, he asserts no specific facts to support this allegation and there was unchallenged deposition testimony from Koester that it was Burrell who had requested a formal written review.

On this record, we agree with the district court that no reasonable jury could infer that racial discrimination or retaliatory intent was the reason or a motivating factor in Burrell's termination.[23]

IV.

For these reasons, we AFFIRM the district court's order dismissing Burrell's claim based on discriminatory and retaliatory discharge. However, we VACATE the order granting Dr. Pepper summary judgment on Burrell's discriminatory failure to promote

---

[23]Cf. Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337 (5th Cir. 2007) (summary judgment on Title VII claim appropriate where employee had failed to rebut employer's insubordination rationale based, in part, on employee's repeated criticisms of direct supervisor). No "clearly better qualified" analysis is necessary on Burrell's termination claims because he did not make any such argument in his brief.

claim and REMAND the case to the district court for further proceedings consistent with this opinion.

AFFIRMED IN PART.

VACATED IN PART.

REMANDED.