# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60156

United States Court of Appeals
Fifth Circuit

**FILED**
December 17, 2013

Lyle W. Cayce
Clerk

GEORGIOS Y. LAZAROU, Ph.D.,

Plaintiff-Appellant

v.

MISSISSIPPI STATE UNIVERSITY; BOARD OF TRUSTEES, INSTITUTIONS OF HIGHER LEARNING,

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:07-CV-60

Before KING, BENAVIDES, and DENNIS, Circuit Judge.

PER CURIAM:*

Georgios Y. Lazarou ("Lazarou"), a native of Cyprus, brought suit against Mississippi State University ("MSU") and Institutions of Higher Learning's Board of Trustees ("IHL"), asserting national-origin discrimination in violation of Title VII and in connection with his unsuccessful tenure application in MSU's Department of Electrical and Computer Engineering.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-60156

The district court granted summary judgment in favor of MSU and IHL, and Lazarou appealed. For the reasons that follow, we AFFIRM.

## BACKGROUND

Lazarou joined MSU as a tenure-track, assistant professor in the university's Electrical and Computer Engineering Department in August 2000, working under a series of one-year employment contracts. As a tenure-track faculty member, Lazarou underwent annual reviews, which included discussion of his research record. Beginning with his first annual review, in 2001, and continuing until his last annual review, in 2004, prior to submitting his tenure application, Lazarou's supervisors repeatedly highlighted concerns regarding his research, including with respect to external sources of funding and his lack of scholarly publications. Lazarou's performance in this area was described by one evaluator as "not consistent with successful tenure and promotion."

In 2005, Lazarou submitted a tenure application. A tenure application is reviewed with respect to the applicant's achievements in teaching, research, and service. To be eligible for tenure, the applicant must demonstrate satisfactory performance in all three areas and excellence in at least one area. In evaluating a tenure applicant's performance in research, the reviewers consider "dissemination of original research results in peer reviewed publications and the receipt of funding through competitive grants offered by outside organizations." Once an applicant submits his or her application, the tenure review process begins and consists of multiple levels of review, including submissions by external evaluators and independent recommendations by a department committee, the department chair, a college committee, the college dean, the university provost, and the university president. The ultimate decision whether to grant tenure belongs to the president.

2

No. 13-60156

If the president declines to grant tenure, the applicant may submit a request to the provost to have his appeal reviewed by the University Committee on Promotion and Tenure. The Committee holds a hearing, interviews the applicant and the parties involved in the tenure review process, and issues a recommendation to the provost regarding whether the applicant should have been granted tenure. The provost then undertakes his or her own review of the Committee's recommendation and makes a second recommendation to the president. If the president declines to reverse his or her earlier decision, the decision becomes final unless the applicant appeals to IHL. Upon a final decision to deny tenure, MSU typically provides the unsuccessful candidate with a terminal, one-year employment contract.

The department committee reviewed Lazarou's application and recommended denying him tenure. Thereafter, the department head, the college committee, the college dean, and the provost successively reviewed Lazarou's application and, at each stage, recommended denying him tenure. At each stage, the reviewers determined that Lazarou had demonstrated satisfactory achievement in teaching and service. However, the reviewers also concluded that Lazarou had failed to demonstrate even satisfactory achievement in research and that, consequently, he was not qualified for tenure. The university president concurred in the denial of Lazarou's tenure application.

After being informed of the president's decision, Lazarou appealed to the University Committee on Promotion and Tenure. The Committee conducted an investigation and interviewed Lazarou and others involved in the tenure review process. The Committee declined to reverse the decision to deny Lazarou tenure. The provost, upon a second review of Lazarou's tenure application, again declined to recommend Lazarou for tenure, and the

3

No. 13-60156

president agreed. Lazarou did not appeal to IHL.[1] Instead, he signed a one-year, nonrenewable contract for the 2006–2007 school year. He resigned from the university in January 2007.

Lazarou subsequently filed a charge with the Equal Employment Opportunity Commission ("the EEOC"), claiming that he had been denied tenure because of his national origin. On receiving his right-to-sue letter from the EEOC, he brought suit against MSU and IHL, claiming that he had been unlawfully denied tenure and discriminated against in violation of Title VII. MSU and IHL moved for summary judgment, which the district court granted, and Lazarou filed a timely notice of appeal.

## STANDARD OF REVIEW

"We review a district court's summary judgment *de novo*, applying the same standard as the district court." *Tagore v. United States*, No. 12-20214, 2013 WL 6008901, at *3 (5th Cir. Nov. 13, 2013). "Summary judgment is warranted if, viewing all evidence in the light most favorable to the non-moving party, the record demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id.*; *see* FED. R. CIV. P. 56. "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Tagore*, 2013 WL 6008901, at *3 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"We construe all facts and inferences in the light most favorable to the nonmoving party when reviewing grants of motions for summary judgment." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012) (quoting

---

[1] Consequently, IHL did not participate at any stage in the review or denial of Lazarou's application and is therefore entitled to summary judgment.

No. 13-60156

*Murray v. Earle*, 405 F.3d 278, 284 (5th Cir. 2005)) (internal quotation marks omitted). "[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

## DISCUSSION

### I.

Under Title VII, it is unlawful "for an employer[] . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). The analytical framework for addressing a Title VII claim depends on whether the plaintiff has presented direct or circumstantial evidence of discrimination. *See Jones v. Robinson Property Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Id.* "In a Title VII context, direct evidence includes any statement or document which shows on its face that an improper criterion served as a basis—not necessarily the sole basis, but a basis—for the adverse employment action." *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

> If an employee presents credible direct evidence that discriminatory animus at least in part motivated, or was a substantial factor in the adverse employment action, then it becomes the employer's burden to prove by a preponderance of the

5

No. 13-60156

evidence that the same decision would have been made regardless of the discriminatory animus.

*Jones*, 427 F.3d at 992; *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination.").

"Where[] . . . the plaintiff does not produce any direct evidence of discrimination, we apply the well-known *McDonnell Douglas* burden-shifting framework as modified and restated by this court." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework,

> the plaintiff must first demonstrate a prima facie case of discrimination; the defendant then must articulate a legitimate, non-discriminatory reason for its [adverse] decision . . . ; and, if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reason is a pretext or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic.

*Burrell*, 482 F.3d at 411-12.[2]

"To establish a prima facie case in the context of a denial of tenure, the plaintiff must show that: (1) he belongs to a protected group, (2) he was qualified for tenure, and (3) he was denied tenure in circumstances permitting an [inference] of discrimination." *Tanik v. S. Methodist Univ.*, 116 F.3d 775, 775-76 (5th Cir. 1997). "Other circuits have recognized that tenure decisions

---

[2] Lazarou asserts that the *McDonnell Douglas* burden-shifting framework is inapplicable in mixed-motive cases. Mixed-motive cases are governed by 42 U.S.C. § 2000e-2(m). This circuit has adopted a "modified *McDonnell Douglas* approach" in mixed-motive cases, incorporating § 2000e-2(m) into *McDonnell Douglas*'s third step, as accurately recited in *Burrell*. *See Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005) (internal quotation marks omitted). Lazarou's argument to the contrary is therefore without merit.

in colleges and universities involve considerations that set them apart from other kinds of employment decisions." *Id.* at 776 (citing *Kumar v. Univ. of Mass.*, 774 F.2d 1, 11 (1st Cir.1985); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92 (2d Cir.1984)). "Those factors are: (1) tenure contracts require unusual commitments as to time and collegial relationships, (2) academic tenure decisions are often non-competitive, (3) tenure decisions are usually highly decentralized, (4) the number of factors considered in tenure decisions is quite extensive, and (5) tenure decisions are a source of unusually great disagreement." *Id.* (citing *Zahorik*, 729 F.2d at 92). "Tenure decisions are not, however, exempt from judicial scrutiny under Title VII." *Id.* "To prove a prima facie case, a plaintiff may be able to show 'departures from procedural regularity', 'conventional evidence of bias on the part of individuals involved', or that the plaintiff is found to be qualified for tenure by 'some significant portion of the departmental faculty, referrants or other scholars in the particular field'." *Id.* (quoting *Zahorik*, 729 F.2d at 93-94).

Once the plaintiff has met his burden of demonstrating a prima facie case of discrimination, and if the employer satisfies its burden of producing a legitimate, non-discriminatory reason for the adverse decision, "then the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden, which has never left him: that of proving that the defendant intentionally discriminated against him." *Id.*

## II.

We first consider whether Lazarou has presented direct evidence of discrimination. During his deposition, Lazarou recalled a conversation he had had with James Harden ("Harden"), the head of Lazarou's department, regarding a potential faculty member. According to Lazarou, Harden, allegedly in the context of criticizing Lazarou's ability and willingness to work

with others in the department, suggested that "maybe . . . [Lazarou] ha[d] character issues because of [his] background."[3]

In *Krystek v. University of Southern Mississippi*, which also involved an unsuccessful tenure applicant asserting discrimination in violation of Title VII, we explained that

> in order for comments in the workplace to provide sufficient evidence of discrimination, they must be "1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue."

164 F.3d 251, 256 (5th Cir. 1999) (alteration in original) (quoting *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)).  The *Krystek* court concluded that the interim dean's alleged comment to the plaintiff—"There are different standards for males and females"—was *not* direct evidence of gender discrimination because there was no dispute that the alleged comment was made two years prior to and in a context unrelated to the plaintiff's tenure application.  *See id.*  Similarly, it is undisputed that Harden's alleged comment was made at least ten months in advance of Lazarou's tenure application. Further, the alleged comment was made in the context of Lazarou declining to offer feedback on a potential faculty member.  Finally, the comment— regarding Lazarou's "character issues because of [his] background"—is too ambiguous.  We cannot say whether it related to Lazarou's national origin. *Compare Jones*, 427 F.3d at 992 ("Direct evidence is evidence which, if believed, proves the fact without inference or presumption.").   We therefore conclude that Lazarou has not presented direct evidence of discrimination.  *See Krystek*, 164 F.3d at 256.

---

[3] When deposed, Harden denied making the statement or any words to that effect.

No. 13-60156

### III.

Because Lazarou has failed to produce any direct evidence of discrimination, he must satisfy the *McDonnell Douglas* burden-shifting framework instead. *See Burrell*, 482 F.3d at 411. Our first step is to consider whether Lazarou has demonstrated a prima facie case of discrimination. MSU argues that he was not qualified for tenure, a necessary component of the prima facie case in the tenure-application context. *See Tanik*, 116 F.3d at 776.

When he applied for tenure, Lazarou had a satisfactory record in teaching and service; however, the reviewers unanimously agreed that he had failed to demonstrate satisfactory achievement in the area of research because of a dearth of scholarly publications. For example, when Lazarou submitted his application, he had published only two refereed journal articles (a third was scheduled for publication at the time). Both articles were co-authored, and one was published in a journal considered "low tier" because it utilized a five-day submission-to-publication timeframe and required a publication fee. Moreover, Lazarou's annual reviews included repeated notations concerning the need to buttress his record with respect to publishing. Nevertheless, for his first four-and-a-half years at the university, Lazarou had no refereed publications.

The reviewers also raised concerns related to the accuracy of Lazarou's research. Lazarou's application listed two awards whose amounts were inflated, a large proposal that had not in fact been awarded, and a submitted proposal for which the university had no records. The application also listed a $450,000 National Science Foundation grant. However, the university later determined that Lazarou had not been listed as a principal investigator on the grant application, had not been involved in obtaining the grant, and had not been identified on the grant application in any capacity. Instead, Lazarou had been substituted, after the grant had been awarded and funding had been

received, as the principal investigator because the grant recipient had taken a sabbatical. Although Lazarou acknowledged this in his application, he also answered "100%" in response to a question asking him to list the percentage for which he was responsible for the grant. Under these circumstances, Lazarou has not satisfied his burden of demonstrating that he was qualified for tenure. *Compare Krystek*, 164 F.3d at 257 ("Krystek argues that he was qualified for tenure, but the evidence clearly indicates that Krystek failed to meet an established [university] tenure requirement: publishing scholarly work in 'reputable journals, scholarly presses, and publishing houses that accept works only after rigorous professional review.'").

Nor has Lazarou shown that he was treated differently from a similarly situated tenure applicant. Lazarou asserts that J.W. Bruce ("Bruce"), an American professor who received tenure one year prior to the submission of Lazarou's tenure application, was given more favorable treatment.[4] However, Lazarou has failed to demonstrate a genuine issue of material fact that he was as or better qualified than Bruce. Focusing on research—the area in which Lazarou failed to achieve satisfactory performance—Bruce's record included eight peer-reviewed, refereed journal publications and twelve refereed, published conference papers. By contrast, Lazarou's record included only two peer-reviewed, refereed journal publications and ten refereed conference papers. Although Lazarou asserts that his qualifications vis-à-vis Bruce are genuinely contested, his only record support is a chart, prepared by Lazarou

---

[4] Lazarou also claims that he was as or better qualified than seven other American professors who had been granted tenure: Lori Bruce, Patrick Donohue, Randy Follet, Bryant Jones, Roger King, Robert J. Moorhead, and Bob Reese. Nevertheless, Lazarou fails to support his arguments with respect to Lori Bruce, Jones, or King and his remaining arguments involve irrelevant comparisons or conclusory assertions, insufficient to create a genuine issue of material fact on this point.

himself, purportedly comparing Lazarou with Bruce. The chart states that Bruce had only two peer-reviewed, refereed journal publications, even though Bruce's CV lists eight. Additionally, the chart conclusorily suggests that one of Bruce's publications should not have been counted as "significant" because it was based on "very low quality research work" and published in a journal with "a very high acceptance rate" according to Lazarou. Lastly, the chart purports to criticize those who reviewed Bruce's tenure application because they supposedly credited him with research he conducted *before* joining the faculty at MSU. By contrast, Lazarou's reviewers faulted him for having conducted no research *until* the year he submitted his tenure application. No reasonable jury could conclude, based on this chart, that Lazarou and Bruce were similarly situated. Accordingly, because Lazarou has failed to demonstrate that he was treated differently from a similarly situated tenure applicant, he has failed to carry his burden with respect to the prima facie case. *Cf. Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001) (noting that "the bar is set high for . . . evidence [of the plaintiff's superior qualification] because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" (quoting *Deines v. Tex. Dep't of Prot. & Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999))); *compare Krystek*, 164 F.3d at 257 ("[T]here is no evidence that Krystek was treated differently from female tenure-track assistant professors. Krystek cannot point to a single similarly situated assistant professor who was awarded tenure despite not publishing scholarly work.").

Finally, Lazarou argues that when a university avoids its own procedures, thereby failing to investigate complaints of discrimination in the

tenure process, that is itself evidence of discrimination. MSU prohibits discrimination on a number of grounds, including race, ethnicity, and national origin. The university's nondiscrimination policy further provides that "[a]ny administrator . . . who knows of, or receives, a complaint of discrimination . . . must promptly report the information or complaint to [the Office of Human Resources Management]."

Lazarou, through an attorney, sent a letter to the college dean. The letter appears to have been sent after the department committee and department chair had reviewed his tenure application but before anyone else had done so. In the letter, Lazarou asserts that the department chair's decision not to recommend him for tenure was discriminatory and made on the basis of Lazarou's "ethnic heritage."[5]

Lazarou asserts that, despite his letter, the college dean never reported his claims to the Office of Human Resources Management and argues that his complaints were otherwise never investigated by the university. We disagree. Lazarou ignores an important caveat to the university's nondiscrimination policy. Under "Application," the university's nondiscrimination policy expressly provides that "[t]his policy is not intended to address differences in opinion regarding the validity of employment decisions such as . . . promotion and tenure decisions." Accordingly, the policy that Lazarou contends went unfollowed exempts from its ambit tenure decisions.

Lazarou further ignores that the university *did* investigate—and found meritless—his allegations of discrimination when he appealed the denial of tenure to the University Committee on Tenure and Promotion, the committee

---

[5] Additionally, Lazarou submitted his "objections . . . to actions taken by MSU, its employees[,] and/or agents." However, it is not clear to whom Lazarou submitted these objections. Finally, Lazarou's mentor, Joseph Picone, sent an email to the university president vaguely alleging that Lazarou had been discriminated against.

independently charged with reviewing whether a tenure decision was "prejudiced, arbitrary, or capricious." The committee reviewed all of the tenure-application materials and interviewed the people involved, including the reviewers and Lazarou. Moreover, as part of this process, Lazarou submitted a twenty-eight-page letter and participated in the committee's hearing. Nonetheless, the committee unanimously determined that the decision to deny Lazarou tenure was not prejudicial, arbitrary, or capricious and therefore recommended to the provost that the decision be affirmed. The provost's recommendation remained unchanged, and the president denied Lazarou's appeal.

Lazarou has therefore failed to point to any record evidence that the university did not investigate his allegations of discrimination or otherwise failed to abide by its own nondiscrimination policies. Accordingly, we conclude that Lazarou has failed to carry his burden of demonstrating a genuine issue of material fact regarding whether he was qualified for tenure, a necessary component of his prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework. *See Tanik,* 116 F.3d at 776. Under these circumstances, MSU was entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.