# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 2, 2010

No. 09-20488

Lyle W. Cayce
Clerk

MICHAEL MOSS

Plaintiff - Appellant

v.

BMC SOFTWARE, INC.

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before BENAVIDES, STEWART, and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Michael Moss, a commercial transactions and information technology lawyer, brought this case alleging that software company BMC Software, Inc. (BMC) violated the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*. (ADEA), by declining to hire him when he applied for a Staff Legal Counsel position. At that time, Moss was 68 years old. BMC instead hired a younger lawyer. In response to Moss's claims, BMC asserted that the younger lawyer was the better qualified candidate. The district court granted summary judgment in favor of BMC, concluding that Moss failed as a matter of law to show that he was clearly more qualified than the candidate hired in order to establish pretext and had not proffered any direct evidence of discrimination. We AFFIRM.

No. 09-20488

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A.    Moss Applies for a Position at BMC

In September 2006, at the age of 68, Moss submitted his application for an in-house Staff Legal Counsel position with BMC, a company that develops, licenses, and markets software. BMC's job announcement included the following description of the Staff Legal Counsel position:

Job Functions & Responsibilities:

- Manage the legal aspects of all transactions involving the creation or acquisition of technology for resell [sic] to customers either on a stand-alone basis or as part of a BMC product and subject to either BMC's or another party's end user license, including OEM, Alliance, Development Outsourcing, Resell and other agreements.

- Manage the legal aspects of all transactions involving the creation of migration routes for customers of withdrawn BMC products and methods for extracting additional value from those products

- Create, implement, and maintain policies, processes and programs around the use of third party code

- Provide general legal support for R&D, Alliances, and other business groups

Skills Required:

- Advanced legal drafting and negotiating skills, especially in an IP licensing practice

- Advanced legal and non-legal communication skills

- Advanced team leadership and project management skills

Education/Training Required:

- J.D. from an accredited U.S. law school with top academic credentials

2

No. 09-20488

- Five or more years experience in a transactional IP practice

The Staff Legal Counsel position would report to BMC's Associate General Counsel, Catherine Stallworth. Prior to a restructuring of BMC's legal department, Stallworth had been responsible for the matters that would be assumed by the Staff Legal Counsel and therefore she had the most familiarity with the type of work that would be performed by the successful candidate. Stallworth was responsible for making the final hiring decision.

After Moss applied for the position, he received no response from BMC. Stallworth stated that she rejected Moss's application because he did not have relevant experience and was therefore not qualified for the position. BMC continued to seek applications, and received an application from Monika Lim.

When Moss received no response to his application, he sent a letter directly to BMC's General Counsel, Denise Clolery. In the letter, Moss outlined in greater detail that he believed he possessed the necessary experience and skills for the open position. After receiving Moss's letter, Clolery forwarded his resume to Stallworth. According to Stallworth, she thought "it wouldn't hurt to call" and ask Moss about some of the experience that he described in his letter. Stallworth conducted a telephone interview with Moss. During the conversation, Moss stated that he had experience with what BMC referred to as OEM transactions, but that he used different terminology to describe that type of work. Based on the telephone interview, Stallworth scheduled Moss for an in-person interview.

Moss and Lim interviewed at BMC on the same day. Both candidates interviewed with Stallworth, Clolery, and two other members of the legal department. At the conclusion of the interviews, the interviewers met to discuss

the candidates and unanimously agreed that Moss lacked the hands-on experience with the specific transactions necessary for the Staff Legal Counsel position, and would likely be unable to successfully and quickly assume the responsibilities of the position. Moss was not offered the job. BMC hired Lim, who was substantially younger than Moss.

## B.    Moss's Qualifications

Moss obtained his law degree from Berkeley in 1964 and then worked for two years at a litigation firm in California. He then joined a Chicago law firm, and made partner after three years. Moss remained at that firm as a partner for the next five years, until the firm dissolved. At that time, Moss formed another firm with some of his former partners, Katten Muchin. There, Moss handled complex corporate transactions, became the firm's draftsman, and had a role in overseeing all of the transactions that the firm handled. After eleven years with Katten Muchin, Moss moved to another firm, Neiman & Grais, as a partner.

Five years later, Moss joined Gordon & Glickson as a partner. Gordon & Glickson was a specialized information technology (IT) law firm. For the next 14 years, Moss did nothing but IT transactions, which primarily involved software licensing. During that time, Moss was intimately involved in reviewing software license agreements and modifying the agreements as necessary to protect his clients. Moss was responsible for translating all of the technical concepts of a deal into contract-grade wording. Moss also did a substantial amount of systems integration work, which involved the installation of hardware and software applications to fit a customer's needs. In 2004, Moss retired from the firm.

No. 09-20488

## C.    Lim's Qualifications

Lim received her law degree in 1997 from Regent University School of Law in Virginia and then worked for three years at a litigation firm in Irving, Texas. She subsequently spent one year working in Hong Kong as in-house counsel to a company offering satellite and multimedia broadcast services in Asia and the Middle East. There she structured, negotiated, and drafted contracts with the company's technology partners.

Lim next moved to a position as in-house counsel for Landmark Graphics Corporation, a subsidiary of Halliburton Energy Services, where she had been working for four years at the time she applied for the position at BMC. At Landmark, Lim handled software licensing and open source code legal issues, and her resume reflects responsibilities including: negotiating software licensing, managing open source legal issues, managing alliance partner matters, and assisting with outsourcing. Lim handled several software OEM agreements and was extensively involved in software licensing. Lim interacted with numerous internal client groups, balancing the various interests of those groups to manage transactions and projects related to software issues.

## D.    ADEA Lawsuit

In March 2007, Moss filed a charge of age discrimination against BMC with the Equal Employment Opportunity Commission (EEOC) and in October 2007 the EEOC issued a Notice of Right to Sue letter. In January 2008, Moss filed the present action in district court. The district court granted summary judgment in favor of BMC, concluding that although Moss established a prima facie case of discrimination, BMC had advanced a legitimate, non-discriminatory reason for not hiring Moss. The district court held that, as a matter of law, Moss

had failed to show that he was clearly more qualified than Lim in order to establish pretext, nor had he proffered any direct evidence of discrimination.

## II. DISCUSSION

We review the grant of a motion for summary judgment de novo, applying the same standard as the district court. *Threadgill v. Prudential Sec. Group, Inc.*, 145 F.3d 286, 292 (5th Cir. 1998). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, the court views all facts and evidence in the light most favorable to the non-moving party. *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006). Mere conclusory allegations are insufficient to defeat summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

Moss asserts that the district court erred in granting summary judgment because it improperly discounted his evidence that BMC's articulated reasons for not hiring him were pretext and because it improperly disregarded evidence of a discriminatory intent.

## A.    Pretext Analysis

Under the ADEA, "[i]t shall be unlawful for an employer to fail or refuse to hire . . . any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish an ADEA claim, "[a] plaintiff must prove by a preponderance of the evidence (which may

be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009).

Applying the framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), "[a] plaintiff relying on circumstantial evidence must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007). If the employer articulates a legitimate, non-discriminatory reason for the employment decision, the plaintiff must then be afforded an opportunity to rebut the employer's purported explanation, to show that the reason given is merely pretextual. *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010).

In determining whether the plaintiff's rebuttal precludes summary judgment, "[t]he question is whether [the plaintiff] has shown that there is a genuine issue of material fact as to whether this reason was pretextual." *Id*. A plaintiff may show pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Id*. (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). A showing that the unsuccessful employee was "'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected" will be sufficient to prove that the employer's proffered reasons are pretextual. *EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995).

1. Whether Moss was "Clearly Better Qualified" than Lim

The parties agree that Moss made out a prima facie case of age discrimination and that BMC has asserted a legitimate, nondiscriminatory reason for hiring Lim. The contested issues arise under the pretext stage of the

analysis. Moss first asserts that he has presented sufficient evidence to create a genuine issue of material fact as to whether he was clearly better qualified than Lim for the Staff Legal Counsel position.

To show that he was "clearly better qualified" than Lim and raise a fact question as to whether discrimination was a factor in BMC's hiring decisions, Moss must present evidence from which a jury could conclude that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Texas Dep't of Protective & Regulatory Servs.*, 164 F.3d 277, 280–81 (5th Cir. 1999). "[U]nless the qualifications are so widely disparate that no reasonable employer would have made the same decision," *id.*, any "differences in qualifications are generally not probative evidence of discrimination," *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001). Thus, "the bar is set high for this kind of evidence." *Id.*

a. *Quality and Extent of Experience v. Specific Experience*

Moss first claims that he was clearly better qualified than Lim for the Staff Legal Counsel job based on the higher quality and extent of his legal experience with IT licensing and commercial transactions. BMC responds that despite Moss's excellent qualifications and greater length of experience, Lim's work experience was better suited to the specific needs of BMC—particularly with respect to the OEM transactions for which the Staff Legal Counsel would be responsible.

"[A]n 'attempt to equate years served with superior qualifications . . . [is] unpersuasive.'" *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir. 1996) (quoting *Bodenheimer v. PPG Indus.*, 5 F.3d 955, 959 (5th Cir. 1993)).

"Obviously, work experience is one component of defining who is more qualified," but "greater experience alone will not suffice to raise a fact question as to whether one person is clearly more qualified than another." *Id.* (internal quotations and citations omitted). In *EEOC v. Louisiana Office of Community Services*, this court recognized that the fact that a candidate's experience is recent and specialized in relation to the job at issue is a consideration relevant to qualification, in addition to simple length of experience. 47 F.3d at 1444–45; *see also Odom v. Frank*, 3 F.3d 839, 846 (5th Cir. 1993) (noting that the hired candidate "had significant recent experience in several of the . . . areas that were most relevant to the new position. . . . Most of the work for which [plaintiff] had been primarily responsible during the several years preceding [ ] the application process simply was not relevant to the new position.").

As the district court noted, both Moss and Lim met the basic skills and education requirements for the job. Both had a J.D. from an accredited law school, had five or more years of experience in a transactional IP practice, had a record of advanced legal drafting and negotiating skills in an IP licensing practice, and had demonstrated advanced communication, leadership, and project management skills. A review of the two resumes demonstrates that Moss undoubtedly has more experience and higher-level experience generally. But Moss' undisputedly lengthier tenure of experience—fourteen years practicing IT law compared with Lim's five years—does not necessarily demonstrate superior qualifications. *Nichols*, 81 F.3d at 42.

BMC asserts that handling OEM agreements was a critical responsibility of the position. Consequently, BMC claims, because Lim's experience with OEM software transactions "was directly on point" for the specific needs of the Staff

9

Legal Counsel position, and Moss simply lacked experience with the type of OEM software agreements for which the attorney hired would be responsible, he cannot show that he was "clearly better qualified" for the position than Lim. Moss argues that, contrary to BMC's assertions, he has extensive experience working on OEM transactions or similar OEM-type transactions.

Beyond his own conclusory assertions, Moss advances no evidence that he has experience with OEM transactions. OEM refers to Original Equipment Manufacturer; in the software context an OEM agreement refers to an agreement under which a party licenses software from another company and resells that software as its own or as part of a larger software product it owns or licenses. Moss described his areas of principal expertise as IT outsourcing and systems integration. Although Moss claims that his areas of experience dealt with "identical issues which BMC was required to address in handling the transactions that they labeled as 'OEM agreements,'" his deposition testimony regarding his OEM-type work experience was vague: he discussed his work in broad terms of contract, he had trouble with software-specific technical terminology, and he could not detail how his prior deals involved OEM-type work. He revealed his lack of familiarity with OEM transactions in the software context when he frankly admitted that in order to prepare for his deposition he "pulled an OEM license agreement . . . just to see what—in a conventional setting, where the licensee was somebody situated similarly to BMC—what they would consider the issues to be . . . I just looked it up on Google. I looked up OEM software licenses."[1] Moreover, Moss forthrightly stated in his deposition

---

[1] The excerpt from the deposition is included below:

Q: Did you review any other documents, sir, in preparation for the deposition,

No. 09-20488

testimony that during his interview with Stallworth, "[o]nce she went into the business about how the OEM was really the key to the deal, I made it very clear to her that OEM was not an area of specialty for me . . . ."[2] He further stated that "I [ ] hadn't spent time with the sole transaction being a deal that you could identify as a self-contained OEM licensing deal."[3]

---

other than those that you have just mentioned? . . .

A: I thought of one. I pulled—and I don't even remember the source or who it was, or whatever—but I pulled an OEM license agreement, because that has been the subject of so much discussion here, just to see what—in a conventional setting, where the licensee was somebody situated similarly to BMC—what they would consider the issues to be, and to see how that stacked up against the discussions that I had with Catherine Stallworth in my initial interview with her, where we had a discussion of OEM software licenses.

Q: Okay. And, specifically what OEM license agreement did you pull?

A: I don't remember. . . . I just looked it up on Google. I looked up OEM software licenses. And one of the links that came up was to a license agreement with a company that looked to me like a large sized company that might in some way—that it—I assumed they were themselves an original producer, manufacturer, whatever of software, a la BMC; so I thought that might be reasonably representative.

[2] To place the statement in context, the entire excerpt from the deposition states:

Q: Do you remember anything else about that call, what you shared with Ms. Stallworth with regard to your qualifications for the position?

A: Well, one thing stands out in my mind. And that is, I think I bent over backwards to tell her what I wasn't, and what I didn't have. Once she went into the business about how the OEM was really the key to the deal, I made it very clear to her OEM was not an area of specialty for me, that I had done transactions relating to it, and transactions that actually amounted to an OEM, but where we didn't so label it. And, therefore, you know, she should be aware that if she was looking for somebody who had been doing nothing or nearly nothing but OEM inbound licenses, I wasn't that person.

[3] This statement appeared in the following context:

Q: What, specifically, did [Stallworth] say to you, that indicated to you . . . that the breadth of your experience would be something that the group could exploit?

No. 09-20488

BMC's employment requisition form and job announcement also stated that, in addition to OEM agreements, the Staff Legal Counsel would be responsible for Alliance and Development Outsourcing agreements. Regarding the term "alliance" in the job announcement, Moss stated that:

> I didn't know what the heck it meant. . . . they use jargon all the time in the IT industry—I wasn't sure what "alliance" meant. But to the extent it seemed to suggest [ ] more than one party on the same side of a transaction, where their interests are more or less aligned, yeah, I have done that many times.

In the software development industry, according to Stallworth, "alliance work is when you use a peer or a similar company's technology for testing and development, [or] compatibility testing. Sometimes it also has a marketing connotation." With respect to Development Outsourcing, Moss stated "I don't know that there is such a concept, at least in my lexicon, as development

---

. . .
A: —she said: Boy, you—something like: You've really covered a lot of stuff. And, you know—this is part of the same conversation—you know [ ] so much about software licensing, there won't be any trouble with OEM. And, moreover, you know so much other stuff, you could be a real asset around here. You could help other people. You could teach other people. You could fill in, in various places. She might even have used the term "mentoring" or "training" or something. But definitely, we got into the topic that my—the breadth of my background would be an asset. I mean, I came away from that first conversation—literally—I don't want to exaggerate—thinking: I got this job, unless there's something weird going on here. I thought she got it. I thought she knew exactly what I could do. [ ] I gave her every opportunity, with all the [ ] you know, what she might view as the glitches in there about the fact that I didn't—hadn't spent time with the sole transaction being a deal that you could identify as a self-contained OEM licensing deal. That was all before her. She knew that I had never done an open source deal. All these things that are negatives were all out there. And notwithstanding all of that, she's telling me: I want you back. I want you to run through all these other people. And giving me a very strong sense verbally . . . that she really thought I would have the job, that she wanted me to do the job, and that she thought that I would get the job.

outsourcing. Maybe it means something at BMC. But to me . . . development and outsourcing are two different concepts. . . . I took those not to be a combined term because, to me, that was almost gibberish." At BMC, Stallworth explained, a development outsourcing agreement is "an agreement where you engage somebody else to take over your development function . . . the creation of software products." The fact that Moss's experience, however extensive, did not entail familiarity with OEM, Alliance, and Development Outsourcing agreements in the software context—the specific transactions for which the Staff Legal Counsel would be responsible—was relevant to the hiring decision. *Odom*, 3 F.3d at 846.

Because Moss lacked experience with the three specific types of transactions that comprised the primary responsibilities of the Staff Legal Counsel, whereas Lim had been performing precisely those types of transactions in her prior job, Moss cannot show that he was "clearly better qualified" than Lim for the position. Although Moss' accomplishments and qualifications are unquestionably impressive, as this court has stated on numerous occasions:

> The ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions nor was it intended to transform the courts into personnel managers. The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated.

*Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988).

b. *Validity of the Emphasis on OEM Transactions*

Moss further argues that even if experience or lack thereof as to one particular type of transaction may in some situations be dispositive of a hiring decision, such is not the case here. He asserts that BMC's emphasis on OEM

transactions "smacks of pretext" because BMC overlooked Moss's superior experience as to the other responsibilities covered by the job.

An employer's reliance on a previously unmentioned job requirement to justify a challenged hiring decision would raise a genuine issue of material fact as to pretext. *See Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1143 (9th Cir. 2001) (holding that the fact-finder could regard an employer's explanation as pretextual when the person promoted became qualified for the position only after a change in the job requirements); *Williams v. Nashville Network*, 132 F.3d 1123, 1132–33 (6th Cir. 1997) (per curiam) (holding that the fact-finder might view the employer's explanation as pretextual when the employer's proffered reason for hiring another candidate was not a listed job requirement). Here, for example, BMC also cites Moss's lack of experience with open source licensing and Lim's experience as in-house counsel as influencing their conclusion that Lim was better qualified for the Staff Legal Counsel position. Neither experience with open source licensing nor experience as in-house counsel, however, were listed in the job announcement or BMC's internal job requisition form as responsibilities or desired qualifications; although these qualifications are likely relevant to the position, we do not consider them for purposes of summary judgment.

Our review demonstrates that BMC's emphasis on hands-on experience with OEM, Development Outsourcing, and Alliance transactions is supported by the record. Not only were these responsibilities listed in the job announcement and BMC's internal job requisition form, but the affidavits and deposition testimony of Stallworth, Clolery, Lim, and other members of the legal department confirm that experience with these specific agreements was a

central and legitimate hiring consideration. Clolery stated that "the key responsibility of this position was to handle the very important OEM transactions, both inbound and outbound, that BMC was involved in." Stallworth said that the Staff Legal Counsel was expected to spend approximately 70% of his or her time on managing transactions involving the creation or acquisition of technology for resell to customers through OEM, Alliance, Development Outsourcing, and Resell agreements. The BMC legal department therefore commonly referred to the Staff Legal Counsel position as the "OEM Attorney" position. Clolery further explained that BMC needed the new hire to "get up to speed quickly" and Stallworth similarly stated that BMC needed an individual in the Staff Legal Counsel position who could "hit the ground running" and "operate immediately with little supervision." They therefore believed that someone who had previously worked on these specialized types of transactions in the software context would be optimal.

Lim confirms that the focus on OEM transactions was genuine: she stated that during her interview Stallworth asked about her software licensing experience and her reseller OEM experience. She explained in her deposition that the primary responsibilities of the job were "[n]egotiating OEM agreements and responsibility in general for the legal portions of OEM agreements. . . . oversee[ing] the open source program, the reseller contracts which were the market zone contracts, alliance agreements and general questions from R and D." When she started with BMC she worked mainly on "OEM agreements, alliance agreements, market zone agreements. . . ."

Moss argues that the evidence offered by BMC and relied on by the district court was not proper summary judgment evidence because it consisted of

No. 09-20488

"[BMC's] own self-serving statements." But "[s]worn affidavits . . . are certainly appropriate for review on a Rule 56 motion for summary judgment" and Moss has proffered no evidence suggesting this testimony to be less than truthful. *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 398 (5th Cir. 2007). Moreover, Moss has not asserted in the district court or on appeal that additional discovery would produce a quality or quantity of evidence different from the current summary judgment record. Therefore, as the district court concluded, Moss lacks evidence of pretext, and as a matter of law would not be able to prove "that age was the 'but-for' cause of the challenged adverse employment action." *Gross*, 129 S. Ct. at 2352.

2. Standard for Pretext Claims Based on Superior Qualifications

Moss next argues that the district court erred by applying a heightened standard in comparing his qualifications to Lim's—a standard that has been rejected by the Supreme Court. In its summary judgment order, the district court stated that:

> A court can infer pretext if it determines that the plaintiff was "clearly better qualified (as opposed to merely better or as qualified) than the employee[ ] who [was] selected." *Office of Cmty. Serv.*, 47 F.3d at 1444. To demonstrate that the employee who was selected is clearly better qualified than the defendant, the plaintiff must show that "disparities in curricula vitae are so apparent as to jump off the page and slap [the fact finder] in the face." *Odom v. Frank*, 3 F.3d 839, 847 (5th Cir. 1993).

The standard articulated in the first sentence, "clearly better qualified," is good law. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cir. 2007). In *Ash v. Tyson Foods, Inc.*, however, the Supreme Court held that the Eleventh Circuit "erred in articulating the standard for determining whether the asserted nondiscriminatory reasons for [the

16

No. 09-20488

employer's] hiring decisions were pretextual" when it stated that "[p]retext can be established through comparing qualifications only when the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face." 546 U.S. 454, 456–57 (2006) (internal citations and quotation marks omitted).

The district court erred by reciting the "slap you in the face" standard. Although the district court stated the incorrect standard, however, its careful and fact-specific analysis reflects that it actually applied the proper standard. Regardless, as discussed above, summary judgment was appropriate under the correct "clearly better qualified" standard. *See Holtzclaw v. DSC Comm'n. Corp.*, 255 F.3d 254, 258 (5th Cir. 2001) (a panel may "affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court.").

3. Disparate Opportunity to Interview

Moss also claims that BMC's failure to request an interview after he initially submitted his resume, and the fact that his interview with Stallworth was cut short, function as evidence of pretext.

As BMC notes, however, Moss's asserted qualifications for the job were not apparent from the face of his resume. On that basis, Stallworth attested that she initially determined that Moss did not have the requisite experience and chose not to interview him. Moss's subsequent cover letter to Clolery outlined experience related to the position which was not included in his previously submitted resume. Accordingly, Moss's argument that he was not provided an interview before he submitted a cover letter which he patterned after BMC's job posting does not show pretext.

17

Moss's argument that his interview with Stallworth was shorter than Lim's also does not show pretext. Moss's interview process consisted of a lengthy phone interview with Stallworth, and on-site interviews with Stallworth and other senior BMC lawyers. Moss had sufficient time during the interview process to present his qualifications to BMC. Further, the timing of Moss's interview with Stallworth is not evidence of discrimination as the schedule was determined by BMC's human resources department based on the interviewers' availability. Therefore, the fact that Stallworth was last on Moss's interview schedule and he spent more time than allotted with the other interviewers, resulting in less time with Stallworth, does not show pretext.

## B. Motivating Factor

Moss asserts that he presented ample evidence that age discrimination was a motivating factor in BMC's decision not to hire him, sufficient to survive summary judgment. In *Gross v. FBL Financial Services, Inc.*, however, the Supreme Court rejected the application of Title VII's "motivating factor" standard to ADEA cases. *Gross*, 129 S. Ct. at 2349–51. A plaintiff bringing an ADEA claim must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. *Id*. at 2345. In light of the Supreme Court's holding in *Gross*, to the extent that Moss alleges that discrimination was a motivating factor—rather than the "but for" cause—in BMC's decision not to hire him, his claims must fail.

## C. Direct Evidence of Discriminatory Animus

Moss's final argument is that remarks by Stallworth serve as direct evidence of age discrimination. Specifically, Moss asserts that Stallworth's comment that she was searching for a lawyer at a "more junior" level than

18

herself functions as direct evidence of discrimination. BMC claims that Stallworth's comment was facially neutral and not probative of age discrimination.

In some ADEA cases, evidence of pretext is not needed. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). In *Rachid*, for example, the plaintiff presented evidence that the decision maker told the plaintiff ". . . you're too old." *Id.* at 315. The court held that "such comments preclude summary judgment because a rational trier of fact could conclude that age played a role in [the employer's] decision to terminate [plaintiff]." *Id.* at 315–16. However, this court has also "repeatedly held that 'stray remarks' do not demonstrate age discrimination." *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). "In order for an age-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee." *Id.* (citing *Bodenheimer*, 5 F.3d at 958). "Remarks may serve as sufficient evidence of age discrimination if they are: 1) age related, 2) proximate in time to the employment decision, 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 683 (5th Cir. 2001).

Stallworth testified that her statement relating to hiring someone at a "more junior level" referenced the need to hire an attorney at a lower level in the organization, as opposed to the age of the desired candidate. She explained that after her "role changed" and her responsibilities increased at BMC, the Staff Legal Counsel position was created to assume some of her previous

responsibilities, but that they did "not necessarily need someone with [her] level of general experience as [she] would be available to get involved in major matters if needed." As BMC notes, in this context "more junior level" could very well refer to an older individual who went to law school later in life or otherwise had less experience, who would come into the position at a "more junior level" than Stallworth. In fact, Moss himself characterizes the position as "effectively an entry level position." After reviewing the record, we conclude that Stallworth's comment was consistent with the evidence regarding the position, the proposed salary of $8,000-$11,000 per month, and the hierarchy of BMC's legal department. Stallworth's comment was not "direct and unambiguous" or even age-related, and therefore not "probative of [BMC's] discriminatory intent." *Texas Instruments, Inc.*, 100 F.3d at 1181.

## III. CONCLUSION

For the reasons discussed, we AFFIRM the judgment of the district court.