**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 26, 2013

No. 12-40424

Lyle W. Cayce
Clerk

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff-Appellant

v.

DYNMCDERMOTT PETROLEUM OPERATIONS COMPANY,

Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No.1:10-CV-510

Before DAVIS, GRAVES, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

This is an appeal from the district court's grant of summary judgment for DynMcDermott (DM) in an enforcement action brought by the Equal Employment Opportunity Commission (EEOC) under Title I to the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, and Title I of the Civil Rights Act of 1991.  Because a genuine issue of material fact exists, we find that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-40424

the district court erred in granting summary judgment for DM on the claims of discrimination under the ADEA and the ADA. Therefore, we REVERSE.

## FACTS AND PROCEDURAL HISTORY

Phillip Michael Swafford worked for DynMcDermott[1] (DM) as a planner/scheduler for over two years between 1998 and 2000. The record indicates that Swafford was a good, conscientious employee with an excellent attendance record. Swafford was transferred to a higher-paying position in December of 2000 and was laid off in 2003. Swafford's wife was diagnosed with an advanced stage of cancer in the fall of 2007. In 2008, Swafford, who was then self-employed, was encouraged by former co-worker and then-current DM lead scheduler June DuBois to apply for a vacant planner/scheduler position at DM's Big Hill[2] field storage site in Winnie, Texas. DuBois contacted Swafford with the approval of supervisor Ray Wood. Swafford, then 56 years old, applied for the position. Wood emailed the DM recruiter on January 31, 2008, asking for Swafford's resume and saying, "I would like him to be the one we talk to. He has been a scheduler here before and he knows the job[.]"

Wood and DuBois identified Swafford as a good choice and the best candidate, and Wood indicated his desire to hire Swafford for the position. However, site director Tim Lewis, who had longstanding issues with Wood, disagreed. Lewis repeatedly asserted, verbally and in email, that Swafford was a poor choice because he was too old and his wife had cancer, which Lewis said required a lot of Swafford's time at home. Lewis further indicated that, because of DM's aging workforce problem, the position should be filled by someone younger who did not have a disabled spouse.

---

[1] New Orleans-based DynMcDermott contracts with the Department of Energy (DOE) to manage the country's strategic petroleum supply.

[2] Big Hill is one of DM's four crude oil petroleum storage sites.

2

No. 12-40424

With regard to relevant emails, on February 4, 2008, Lewis sent a confidential email to his supervisor, Deborah Hojem, the New Orleans-based Director of Operations and Management for DM, saying:

> I may need to get Mike Swafford as a temp to help out until we get a new hire.
>
> Ray, June and Danelle wanted to hire him permanently. Mike had been previously trained to do this job since he was having problems doing his job as and [sic] I&C tech. I just put the nix to this for following reasons that I can only tell you.
>
> 1.     He was riffed already
> 2.     His wife has cancer and requires and [sic] lot of his time at home
> 3.     He is at least 56 and has his own medical problems (he had bad attendance record when he was riffed)
>
> We have only had about two, maybe three other applications. Everyone seems to be at least in their 50's. Now I don't have a problem with "young folks" but I need to have someone that will be here for a long, long time.

Lewis' claim that Swafford had bad attendance when he was laid off is unsupported by the record. Lewis testified at his deposition that Swafford did not miss a lot of work while employed at DM. Also, others said that Swafford actually had an excellent attendance record.

Lewis also told DuBois and Danelle Houston, another DM planner/scheduler, on February 4 that he was opposed to hiring Swafford because of his age and because his wife had cancer.

On February 6, 2008, Lewis sent an email to DM employee Chris Breaux, with a copy to Hojem, which said:

> As you know, we lost one of our three schedulers a week or so ago. I stopped the hiring of a person who used to work here several years ago and who was riffed. He also had bad attendance record and a very ill spouse (cancer). However, he was trained in doing

3

No. 12-40424

scheduling since he could not go out into the field to do his regular I&C (at that time) work.

Long story short.  In discussing this with June DuBois, (who by the way had ALREADY CALLED THIS PERSON), she said that it takes 1.5 YEARS to learn the job.

I just decided not to say anything.

How long do you feel it would take to train a newbe [sic] (someone out of high school and maybe wanting a career – maybe in mid-twenties or so)?

My personal opinion (and that is all it is) is that a person could be pretty darn good within 6 months.
Thanks.

Tim

On February 7, Lewis told Wood during a managers' regular morning meeting that he did not want Wood to hire Swafford because of Swafford's age and his wife's illness.  Wood replied that those requirements were in violation of the law and said Lewis could do the hiring himself.  Lewis testified during his deposition that, when he told Wood at the meeting he was opposed to hiring Swafford, "Ray literally kind of starting [sic] screaming, 'Tim, you're telling me to – you're telling me to commit a felony.  Tim, you're telling me to commit a felony.  Tim, you're telling me to commit a felony.'"  To which, Lewis responded, "[l]ook, Mike is old."

Lewis later sent an email indicating that he would be on the hiring board and drafted a Corrective Action Memo (CAM) against Wood for insubordination based on his comments at the meeting.  The CAM included the following language: "Failure to follow these instructions will result in further disciplinary action up to and including termination."  Lewis forwarded the CAM to Hojem

and Human Resources (HR) Director Dione Heusel for review and edit. Lewis also met with Wood about the CAM.

Shortly after the meeting on February 7, Bernadette Nelson, a DOE employee based at Big Hill who attended the managers' meeting, sent Lewis an email containing a web link to the EEOC guidance on age discrimination in response to his comments. Lewis responded, "[a]ctually, I know about this," offered an explanation as to the need for "folks who can be around a while and continue to contribute" and further referenced the "aging workforce." Lewis then forwarded the EEOC link provided by Nelson to other employees with the following statement: "This morning in reference to hiring a scheduler, I mentioned an age. I have never, nor will I ever discriminate on age or any other issue which is protected by law. Not because it is the law but because it is what is fair."

Lewis later "informally" removed himself from the hiring board, but proceeded with the CAM against Wood. On February 11, 2008, Lewis emailed Hojem of his intention to give Wood the CAM along with a reminder and list of expectations, which said in relevant part:

> You need to keep this as a reminder that you will be held accountable for your actions.
>
> 1. Your insubordination on Feb. 7 had ZERO to do with any failure of mine to communicate with you. Your, "You have to communicate with me, Tim", was a feeble attempt to shift blame to me and to try to justify your insubordination. The blame is 100% on you. You chose to believe June DuBois and you failed to communicate with me. Furthermore, spreading false rumors will definitely not be in your best interest (i.e., that Shelby and I can do the hiring since you also believed that Brigitte was in my office being assured she would get the scheduler position when I had no knowledge of it).
> . . .
> 4. Your insubordination (continued insubordination) will be properly annotated in the written portion of your performance evaluation to ensure this incident is not forgotten.

5

Lewis also indicated that Wood should have received a CAM for a prior incident after a hurricane and that he already had a CAM for sexual harassment. However, Hojem testified in her deposition that she did not know what Lewis was talking about with regard to any CAM for sexual harassment.

Although Lewis drafted the CAM for insubordination and met with Wood about it, the CAM ultimately did not end up in Wood's file. Lewis testified at his deposition that he thought "it died a natural death" because Wood "decided he was going to do the hiring." Further, Lewis said, "Ray, at some point in time, decided he was going to do it. So I didn't pursue it."

On February 8, a DM recruiter forwarded the resume of Mark Thomas, then 34 or 35, to Wood with a note saying, "[t]his resume may be a bit of a stretch of what you are looking for." On February 18, Wood emailed the recruiter and said that only two applicants, Swafford and Raymond Kuykendall, had planner/scheduler background. On February 20, the recruiter sent Wood the resume of Stephen Sajewicz and Wood indicated an interest in interviewing him. On February 25, the recruiter emailed Wood to tell him that she had spoken to Kuykendall, but his salary requirements were too high. She further said, "I got your voice message that you were going to speak with Stephen Sajewicz today on the phone. I guess that leaves your only other candidate as Phil Swafford." Interviews were conducted on February 27, 2008, by Wood, DuBois and Hojem. Swafford, who lived locally, was interviewed in person. There is evidence in the record that Wood asked Swafford, during the interview, if his wife's cancer would interfere with his work attendance and that Swafford indicated it would not. Sajewicz and Thomas, who had never been identified as a qualified candidate, were interviewed over the telephone. Wood brought Thomas in from Virginia for a face-to-face interview at DM's expense while DuBois was on leave and unable to participate. Hojem was also not present for

No. 12-40424

that interview. Wood made a decision to hire Thomas on March 11, 2008, which was prior to Thomas' in-person interview.

On August 26, 2010, the EEOC filed an enforcement action under the ADA, the ADEA, and the Civil Rights Act of 1991, asserting that DM failed to hire Swafford because of his age and because of his association with a family member with a disability. Thereafter, the district court granted DM's motion for summary judgment and the EEOC filed this appeal.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Dediol v. Best Chevrolet*, 655 F.3d 435, 439 (5th Cir. 2011). Summary judgment is proper when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## DISCUSSION

**I.    Whether the district court erred in granting summary judgment for DynMcDermott under the ADEA and the ADA.**

**II.    Whether the district court erred in holding that the evidence would not support a finding that the proffered reasons for the failure to hire were not worthy of credence.[3]**

The EEOC asserts that the district court erred in granting summary judgment because there was ample evidence, whether direct or circumstantial, to send the case to a jury. DM asserts that summary judgment was proper.

---

[3] Because these issues are intertwined, they are combined for discussion.

7

No. 12-40424

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff has the burden of proving by a preponderance of the evidence, direct or circumstantial, that age was the "but-for" cause of the employer's adverse action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Again, a discrimination case may be proved through either direct or circumstantial evidence. *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994).

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973), a plaintiff relying on circumstantial evidence must establish a prima facie case of discrimination. *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010). *See also Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010). The burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for the action. *Moss*, 610 F.3d at 922. If the employer articulates a legitimate, nondiscriminatory reason for the action, the plaintiff must then rebut the employer's purported reason to show that it is merely pretextual. *Id.*

> In determining whether the plaintiff's rebuttal precludes summary judgment, the question is whether the plaintiff has shown that there is a genuine issue of material fact as to whether this reason was pretextual. A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence. A showing that the unsuccessful employee was clearly better qualified (as opposed to merely better or as qualified) than the employees who are selected will be sufficient to prove that the employer's proffered reasons are pretextual.

*Id.* (Internal marks and citations omitted).

8

No. 12-40424

To establish a prima facie case of age discrimination in this context, the EEOC must show that (1) DM failed to hire Swafford; (2) he was qualified for the position; (3) he was within the protected class (age 40 or over) at the time; and (4) a younger person was hired. *Jackson*, 602 F.3d at 378; *see also Haas v. ADVO Sys., Inc.,* 168 F.3d 732, 733 (5th Cir. 1999).

The ADA makes it unlawful for a covered employer to discriminate against an individual because of his disability or because of his relationship or association with an individual with a disability. 42 U.S.C. § 12112(a), (b)(4). Under the ADA, the discrimination need not be the sole reason for the action, but must play a role in the employer's decision-making process and have a determinative influence on the outcome. *Pinkerton v. Spelling*, 529 F.3d 513, 519 (5th Cir. 2008).

This Court has said that, "[t]o qualify as direct evidence, a document [or comments] must be (1) age related, (2) proximate in time to the [action], (3) made by an individual with authority over the termination, and (4) related to the employment decision." *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003); *see also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012).

The district court found that the evidence referenced by the EEOC did not constitute direct evidence because it required drawing certain inferences. Specifically, the district court said:

> First, an inference must be made that despite being removed from the hiring process by Hojem, Lewis still played a role in the decision to not hire Swafford. And second, the fact-finder would have to infer that Wood was cowed by Lewis, even though Wood stood up to Lewis during the February 7 morning meeting, never received the threatened CAM, and was reassured by Hojem that no adverse consequences would arise from Lewis's actions and statements.

The district court further found that, even if the evidence does not require the fact finder to make inferences, Lewis' statements and actions "amount to mere

9

stray remarks" because the EEOC cannot satisfy the element which requires the comment-maker to be the one with authority over the hiring decision. We disagree.

Stray remarks are analyzed under *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996), in direct evidence cases. This Court has said that, post-*Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the stray remarks doctrine remains intact where the plaintiff has failed to produce substantial evidence of pretext. *Auguster v. Vermilion Parish School Bd.*, 249 F.3d 400, 405 (5th Cir. 2001). *See also Wallace v. Methodist Hosp. System*, 271 F.3d 212, 223 (5th Cir. 2001). Here, the district court applied the stray remarks doctrine before determining whether the plaintiff had failed to produce substantial evidence of pretext and then refused to consider those remarks in determining pretext, which will be discussed later herein.

Notwithstanding that the district court's analysis appears to be flawed, courts do not "blindly accept the titular decisionmaker as the true decisionmaker." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000). "Rather, the discriminatory animus of a manager can be imputed to the ultimate decisionmaker if the decisionmaker 'acted as a rubber stamp, or the "cat's paw," for the subordinate employee's prejudice.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003). The relevant inquiry this court has applied in a circumstantial evidence case is whether Lewis had influence or leverage over Wood's decisionmaking. *Id.*

The district court found that "Wood was not Lewis's cat's paw because there is no evidence that Lewis had the requisite influence, control, or leverage over Wood's decision to not hire Swafford." However, this finding is unsupported by the record. There is no dispute that Lewis was Wood's direct supervisor and was responsible for Wood's performance evaluations and implementation of disciplinary actions, such as the CAM Lewis prepared after Wood spoke out

against refusing to hire Swafford based on age and his wife's disability and the statements that Wood should have or did receive discipline regarding two earlier incidents. Also, Wood's pay and any raises were merit-based and dependent on performance reviews done by Lewis. There is additional evidence of an ongoing feud between Lewis and Wood, and that Lewis had refused to communicate with Wood and removed some of his duties as a result of the feud. All of this indicates that Lewis had influence or leverage over Wood's decisionmaking. *Id.* Further, the remarks would appear to meet the other requirements of direct evidence, as set out above.[4]

However, even if the remarks are only circumstantial evidence, the *McDonnell Douglas* analysis would still weigh against DM. As stated previously, under *McDonnell Douglas*, a plaintiff relying on circumstantial evidence must establish a prima facie case of discrimination. *Moss*, 610 F.3d at 922.

To establish a prima facie case of age discrimination, the EEOC must show that (1) DM failed to hire Swafford; (2) he was qualified for the position; (3) he was within the protected class (age 40 or over) at the time; and (4) a younger person was hired. *Jackson*, 602 F.3d at 378. DM indeed failed to hire Swafford, then 56, who was qualified for the position and instead hired Thomas, who was more than 20 years younger. Thus, a prima facie case was established.[5]

---

[4] DM asserts that the EEOC only argues on appeal that there was circumstantial or indirect evidence and, thus, has now waived or abandoned any claim of direct evidence. We disagree. While the EEOC did not strongly argue a claim of direct evidence, it did assert both in its brief. However, even if the EEOC had abandoned a claim of direct evidence, the outcome of the case would not be affected because we find that it would prevail on a circumstantial evidence claim.

[5] The district court found that DM "does not assert, and in fact assumes, that the EEOC has presented a prima facie case of discrimination. Therefore, the Court will proceed to determine whether [DM] has offered a legitimate, nondiscriminatory reason for its decision to hire Thomas and not Swafford and whether the EEOC has shown that reason to be mere pretext for discrimination." On appeal, it also does not appear that DM is asserting that the EEOC has failed to make a prima facie case under the ADEA, although the brief is not very clear. DM does, however, mention a summary judgment claim that the EEOC failed to make

The burden then shifts to DM to provide a legitimate, nondiscriminatory reason for the action. *Moss*, 610 F.3d at 922. DM asserts that Swafford was not hired because Thomas was more qualified. As this would be a legitimate, nondiscriminatory reason for the action, the EEOC must then rebut the purported reason to show that it is merely pretextual. That is, the EEOC may attempt to establish that Swafford was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). "Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143.

Here, the district court said that, because DM satisfied its burden of producing a legitimate, nondiscriminatory reason for its decision, the "burden shifts to the EEOC to show that the reasons given are false or that Swafford was 'clearly better qualified' for the scheduler position." The district court then addressed the EEOC's assertions that the evidence raises a question of fact about whether Lewis influenced Wood's decision, the statements about Thomas' qualifications and about Swafford's previous performance, and the statements by Lewis and other DM management about the "aging workforce."

*Influence*

The district court found that Lewis' statements had no influence on Wood because Hojem had assured Wood that there would be no retaliation from Lewis.

---

a prima facie case under the ADA.

The district court also dismissed evidence in Nelson's deposition that Wood had already decided to hire Swafford on February 7 as an "imprecise recollection" and because interviews did not occur until February 27.

While there is evidence that Hojem spoke to Lewis and Wood regarding retaliation, the timing of these discussions does not alleviate a question of fact regarding influence. Lewis' remarks and resulting threats of retaliation against Wood lasted several days, at least from February 7 until the 11th. The record is not clear as to when Lewis decided not to pursue the CAM. However, the record is clear that Wood had indicated his desire to hire Swafford repeatedly to numerous people prior to receiving the CAM from Lewis on February 11.

In fact, the whole incident at the meeting wherein Lewis accused Wood of insubordination was because Lewis believed Wood "was just wanting to, say, buck the system and try to get – try to get [Swafford] hired without going through the application process." Lewis said that Wood "had said words to the effect of, 'You know, I think Brenda, you know, we've had that slot empty for a long time. What about, you know, hiring Mike Swafford?'" After Lewis disagreed with Wood's desire to hire Swafford, Wood repeatedly informed Lewis that he was violating federal law because Lewis was discriminating based on age and disability.

Also, the record indicates that Hojem did not make any assurance to Wood regarding retaliation until weeks later – after Wood had already decided to interview Thomas, who he had previously not identified as a qualified applicant, and after the CAM had "died a natural death" because Wood had agreed to do the hiring. All of this corroborates the portion of Nelson's deposition referenced by the district court.

For these reasons, the district court's finding that there was no issue of fact about whether Lewis influenced Wood is unsupported by the record.

*Qualifications*

No. 12-40424

With regard to qualifications, the district court found that "Swafford's qualifications were not 'of such a weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Thomas] over [Swafford] for the job in question.'" (Quoting *Celestine v. Petroleos de Venezuela SA*, 266 F.3d 343, 356-57 (5th Cir. 2001) (marks original). We note that this high standard applies in cases where the plaintiff seeks to show that he was "clearly better qualified" than the person selected for the position. *See Celestine*, 266 F.3d at 356; *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 412 (5th Cir. 2007). As we have noted, "[w]hile a showing that a plaintiff is 'clearly better qualified' is one way of demonstrating that the employer's explanation is a pretext, it is not the only way." *Burrell*, 482 F.3d at 412, n.11. Pretext may also be shown by "any evidence which demonstrat[es] the employer's proffered reason is false" or "unworthy of credence." *Id.* at 412 & n.11. "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action." *Laxton*, 333 F.3d at 578. "Merely disputing [the employer's] assessment of [the employee's] performance will not create an issue of fact." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Rather, the question is whether that assessment, "even if incorrect, was the real reason for" the action. *Id.*

As the district court states, Wood completed the evaluation form to hire Thomas. That form provided for scores between zero and two in the categories of education, experience, technical skills, communication skills, interpersonal skills, and customer services skills. A zero indicated the candidate did not meet the minimum requirements, a one indicated that the candidate met the minimum requirements, and a two indicated that the candidate met both the minimum and preferred requirements. Wood said that he and DuBois, in a collaborative effort, compiled the scores. And that DuBois had her own sheet.

But DuBois contradicted that claim, saying that she had never seen the candidate evaluation form and did not assist in its preparation.

Swafford and Thomas both scored a two on all categories except education, where Thomas scored a two and Swafford scored a one. The position does not require a college degree. However, Swafford had an associate's degree, whereas Thomas' resume indicated he had a bachelor's degree. In reality, Thomas had no college degree. While the district court cites cases for the propositions that the employer has a right to rely on the representations made by an applicant and has no duty to verify information, it is worth noting that Thomas was not even asked about his education during the interview. The district court also noted that Wood considered Thomas' military training as part of his education ranking, and that Wood ranked the third applicant a two based on his non-college training. This does not support ranking Swafford lower as he also had military training, spending six years in the Texas National Guard before being honorably discharged.

Moreover, the record establishes that only Swafford had experience with the SAP program used by DM. Further, although Swafford worked as a planner/scheduler at DM for only two years, the record indicates that he used the SAP program during his entire employment at DM from 1998-2003. Swafford also worked in area refineries as an apprentice insulator and a pipefitter/fabricator from 1973 until 1992. Thomas had been a logistical coordinator in the military, which included planning, but had no experience working with the specific system used by DM. Thomas also testified in his deposition that, during his interview, he did not recall anyone asking him about the differences between the program he had used in the Army and the one used by DM. The record also establishes that the program used by DM was unique, which was a reason the position took so long to learn, and that using the program was an essential duty of the scheduler position. Additionally, Lewis

acknowledged that DM had never hired anyone who had gained experience with the SAP system anywhere else, further indicating the uniqueness of the program.

Swafford's performance as a planner/scheduler was above expectations and described as excellent and meticulous. Swafford had an excellent attendance record. Lewis acknowledged that Swafford trained his replacement when he transferred and that he had no performance issues. Further, as stated previously, Swafford's performance and ability was at such a high level that Lewis had sent an email on February 4 saying he may need to hire him temporarily to help out until someone was hired.

Accordingly, the district court's finding that there was no issue of fact regarding the statements about Thomas' qualifications and Swafford's previous performance is unsupported by the record.

*Aging Workforce*

The district court appears to dispute that any statements regarding DM's aging workforce were actually made, but then found that, "[a]ssuming all of these statements were made, they do not raise an issue of pretext because they do not 'refer in any way to [Swafford's] age, let alone the age of any applicant or employee, or the employment decisions of which he complains.'" The district court then said that many of Lewis' statements about the "aging workforce" were directly related to the hiring of a new planner/scheduler and that "Lewis was concerned with being able to replace people who retired with others who would work in the company for a long period of time." The district court then found that, "because he did not have any influence over the hiring decision, as the Court has already found, his statements cannot raise a genuine issue of pretext." We disagree.

Finally, the court found:

No. 12-40424

    None of the EEOC's proffered circumstantial evidence raises a fact issue but-for Swafford's age, [DM] would have hired him; nor does the evidence demonstrate that Swafford's association with a person with a disability was either a but-for cause of [DM's] decision or a motivating factor in its decision.

    The Court concludes that the EEOC has not presented sufficient direct or circumstantial evidence to overcome summary judgment. Thus, the EEOC has not met its burden under the but-for causation standard of the ADEA, or either the but-for or mixed motive standard of the ADA, whichever standard is applicable.

Hojem admitted that DM site directors had met to discuss ways to deal with its "aging workforce" problem, such as by creating a knowledge-retention system to capture "knowledge association with a particular job that we could transfer to the new person." Hojem also admitted that Lewis told her that he said during the February 7 meeting "that he did not want to hire Mr. Swafford because of his age and the fact that his wife was ill, and it would cause him to miss work." Hojem said she told him that his action was highly inappropriate and against the rules and regulations. However, she neither addressed the issue in writing nor responded to Lewis' various emails wherein he made statements similar to what he had said during the meeting. Rather, she said she never received the various emails. However, Heusel, who was copied on some of the emails to Hojem, replied to at least one, thanked Lewis for keeping her in the loop, and told him to "[p]lease let me know if/how we can support you."

Lewis acknowledged the trustworthiness of other employees who made statements regarding his remarks and the events that occurred. He also admitted that he had made certain remarks at the meeting, but then attempted to distinguish between "age" and "old," saying: "I said, 'Look, Mike is old.' That's what I said. The intent was absolutely nothing to do with don't hire him, because of age. I never mentioned age." Lewis did not remember saying anything about Swafford's wife having cancer, but again acknowledged the

17

trustworthiness of other employees who gave statements to the contrary. Lewis, who denied knowing that DuBois wanted to hire Swafford, said that he went to explain to DuBois and Houston what had happened at the meeting because "I knew they wanted him in there."

The record also indicates that Hojem had approved the travel for Thomas' call back interview by 7:10 a.m. on February 27, 2008, which was before any of the interviews had been done. Also, as stated previously, the call back interview for Thomas was merely a formality, as Wood made the decision to hire him on March 11, 2008, which was prior to Thomas traveling from Virginia at DM's expense for the face-to-face interview. Wood testified that, despite the fact that a "phone interview is quite hard to do" because "you can't reach the personality or any of that type stuff," here "[t]he scoring was already done before [Thomas] came. All I wanted to do is verify what he was telling me in the interview process and get to meet him."

For these reasons, the district court's finding that there was no issue of fact about whether the aging workforce statements were pretextual is not supported by the record.

Because this case is here on summary judgment review, this Court views the evidence in the light most favorable to the EEOC, taking the record evidence and all reasonable inferences therefrom in its favor. According to the EEOC's version of the facts, which are supported by the record, Lewis' remarks were not an isolated incident. They continued for a number of days and were offered both verbally and in emails. The remarks were never offered in conjunction with any other potential reasons for not hiring Swafford. Lewis never said he was opposed to Swafford because there was a more qualified candidate. Instead, Lewis only offered Swafford's age and wife's illness as a basis for not hiring him. Further, Swafford was rejected by Lewis before Thomas ever applied. Lewis' supervisor, Hojem, and HR Director Heusel were copied on the exchanges

18

regarding Lewis' opposition to Swafford because of his age and the fact that his wife had cancer. Lewis further had sent earlier emails to Hojem indicating that he had "put the nix" on Wood's desire to hire Swafford permanently because of his age and his wife's health problems. Additionally, the entire matter was brought to the attention of DM CEO Bob McGough and General Counsel John Poindexter. However, there is no indication that they ever took any action. Also, Wood repeatedly indicated his desire to hire Swafford until he was given the CAM by Lewis.

Based on all of that, the evidence is such that a reasonable jury could return a verdict for the EEOC, finding that but for Swafford's age and disabled wife, DM would have hired him. Thus, a genuine issue of material fact exists and the district court erred in granting summary judgment for DM on the claims of discrimination under the ADEA and the ADA. Therefore, we reverse.

## III.   Whether the district court erred in granting summary judgment on the Commission's request for liquidated and/or punitive damages.

The district court merely found that, because the "EEOC has not presented sufficient direct or circumstantial evidence of intentional discrimination to overcome summary judgment, the Court further concludes that summary judgment is proper on the EEOC's claims for liquidated and punitive damages."

Liquidated damages are available in cases of willful violations of the ADEA. 29 U.S.C. § 626(b). A violation is willful if the employer knew or showed reckless disregard of whether its conduct was prohibited by statute. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 617, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

Under the ADA, a complaining party may recover punitive damages if it proves that the defendant engaged in "discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

No. 12-40424

Here, both Lewis and Wood repeatedly indicated, as set out previously herein, that they knew discriminating against Swafford because of his age or his wife's disability was illegal.  Because the EEOC has presented sufficient evidence to overcome summary judgment, we likewise reverse the district court's grant of summary judgment on the claims for liquidated and punitive damages.

## CONCLUSION

For the reasons set out herein, the district court erred in granting summary judgment to DM on the claims for discrimination under the ADEA and the ADA, as well as the claims for liquidated and punitive damages.  Therefore, we REVERSE.