**Marquita HIGGINS, Plaintiff–Appellant**

v.

**LUFKIN INDUSTRIES, INCORPORATED, Defendant–Appellee.**

No. 14–41440.

United States Court of Appeals, Fifth Circuit.

Dec. 16, 2015.

Alex Arthur Castetter, Stuckey, Garrigan & Castetter Law Offices, Nacogdoches, TX, for Plaintiff–Appellant.

Christopher Velle Bacon, Vinson & Elkins, L.L.P., Houston, TX, for Defendant–Appellee.

Before JOLLY, HIGGINBOTHAM, and SMITH, Circuit Judges.

PER CURIAM:[*]

Plaintiff Marquita Higgins brings this appeal, contending that the district court erred in granting summary judgment against her claims for quid pro quo sexual harassment, hostile work environment sexual harassment, and retaliation, all brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. After full briefing and argument, we affirm for the reasons that follow.

## I.

Marquita Higgins worked at Lufkin Industries from June 2011 until June 2012. Higgins asserts that a co-worker at Lufkin, Lance Redd, made sexually and racially offensive comments to her. Higgins is a black female; Redd is a white male.

There were two specific occasions during which Redd made inappropriate comments or advances. The first occurred in January 2012, when Redd stated to Higgins that he had "never been with" a black woman before. When Higgins ignored the comment, Redd called her a "nigger bitch" and a "whore." Redd also quoted sexually suggestive hip-hop lyrics to Higgins. The second incident of inappropriate conduct occurred in early March 2012, when Redd told Higgins that he would "write her up" for a disciplinary infraction unless she "gave him some." Higgins once again turned down Redd's sexual advances. Higgins also reminded Redd that he was not her supervisor, and thus lacked the authority to discipline her.

Later that month Redd was appointed to a supervisory position at one of the Lufkin facility's loading docks. Higgins did not work in the loading docks section of the Lufkin facility. Instead, she worked in the warehouse section, and asserts that her regular work supervisor was Binu Thomas, not Redd. On April 5, 2012, Higgins volunteered for an open shift at the loading dock, however, and thus was under Redd's direction. During this shift, Higgins was performing one task ("taping off a gear box") when Redd instructed her to move to

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

another task ("knocking over some crank pins"). Higgins told Redd that she would move to the newly assigned task as soon as she finished her current task. Redd became angry at Higgins for not following his instruction. He ultimately disciplined Higgins by sending her home for the remainder of the day, albeit without a loss of pay. Higgins does not allege that Redd made any sexually or racially inappropriate remarks during the April 5th incident.

The following day, Higgins met with David Duford, the Human Resources Manager at Lufkin, to discuss the incident. During this meeting, Higgins also told Duford about Redd's inappropriate comments and sexual advances. At Duford's request, Higgins submitted to Duford a written statement detailing Redd's inappropriate behavior. Duford met with Higgins at least twice more to discuss the written allegations. Although Duford reminded Redd of the company's harassment policies, Redd was never punished.

Higgins was fired following events that occurred during her shift on the evening of June 14, 2012. During that shift, Redd informed Safety Specialist Alvin Quick that, according to another employee, Higgins had brought marijuana to work. Redd and Quick located Higgins sitting on her forklift, which had recently stalled out. Quick asked Higgins to properly secure her safety goggles, which were currently resting on her head. Higgins did so, and soon thereafter managed to restart the forklift's engine with the help of a technician. Higgins drove off, but, after noticing continuing problems with the forklift, stopped to talk to Thomas about the forklift issue. Quick approached Higgins and

Thomas while they were in discussion. Quick asserted that Higgins was operating the forklift erratically, and requested that she submit to a drug test.

Reporting for work under the influence of any controlled substance is a violation of Lufkin's employee policies. Lufkin policy requires employees to submit to reasonable suspicion drug tests; those who refuse to do so are "subject to immediate termination without further notice or cause." Conversely, although Lufkin employees are disciplined for a first-time positive result on a drug test, they are not fired. Nevertheless, Higgins refused to take the drug test, as she suspected that Quick's request was at Redd's direction. Higgins asserts that she would have taken the test that evening if it were given by anyone other than Redd or Quick.[1]

Following her refusal to take a drug test, Higgins was told to leave work and to show up at Lufkin's main safety building at 8:00 a.m. the following morning to take a drug test. Higgins arrived at the main safety building at 7:30 a.m., but fell asleep in the lobby for several hours. Upon waking, Higgins called Duford. Duford told Higgins that she was suspended pending investigation. Higgins met with Duford and other members of Lufkin management on June 20th, and was fired after admitting to having been under the influence of Vicodin on the night of June 14th. Although Higgins asserts that the Vicodin was prescribed to her, she apparently does not dispute that she should not have been under the medication's influence while operating the forklift.

---

1. Higgins apparently concedes, however, that Redd would not have actually been present for any drug test administered on the evening of June 14th. Lufkin's drug policy states that only a person of the same sex as the employee being tested can administer the drug test, and Higgins admits that Quick and Thomas sought out a female employee to administer the test.

Higgins filed suit against Lufkin on July 11, 2013. Higgins's complaint asserted Title VII-based claims for quid pro quo sexual harassment, hostile work environment sexual harassment, and retaliation. The district court granted summary judgment against all claims. The district court granted summary judgment against Higgins's quid quo pro sexual harassment claim because Redd was not a "supervisor" at the time the harassment occurred, even though he later became a supervisor. The district court granted summary judgment against Higgins's hostile work environment claim because Higgins failed to create a genuine issue of material fact regarding whether the harassment was "severe or pervasive." Finally, the district court granted summary judgment against Higgins's retaliation claim because Higgins failed to create a genuine issue of material fact regarding whether Lufkin's stated reason for firing her was pretextual. Higgins brings this appeal.

## II.

"We review the grant of a motion for summary judgment de novo, applying the same standard as the district court." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir.2010) (citing *Threadgill v. Prudential Sec. Grp., Inc.*, 145 F.3d 286, 292 (5th Cir.1998)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When considering a motion for summary judgment, the court views .all facts and evidence in the light most favorable to the non-moving party." *Moss*, 610 F.3d at 922 (citing *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir.2006)).

## III.

### A.

First, Higgins contends that the district court erred in granting summary judgment against her quid pro quo sexual harassment claim. Specifically, Higgins urges that the district court erred in granting summary judgment against her quid pro quo claim solely because Redd was not a "supervisor" at the time he propositioned Higgins for sex.

To succeed on a Title VII quid pro quo claim against an employer, a plaintiff must show (1) that she suffered a tangible employment action; and (2) that the tangible employment action resulted from the acceptance or rejection of a supervisor's sexual advances. *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 772 (5th Cir.2009) (citing *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir.2002)). A "tangible employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). An individual is a "supervisor" for the purposes of a quid pro quo claim if he or she has the authority to take a tangible employment action against the plaintiff. *Vance v. Ball State Univ.*, —— U.S. ——, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013) ("We hold that an employee is a 'supervisor' for purposes of [an employer's] vicarious liability under Title VII if he or she is empowered to take tangible employment actions against the victim . . . .").

This Court need not consider whether the district court erred in granting summary judgment on the grounds that Redd was not a "supervisor" at the time he propositioned Higgins for sex, since Higgins has failed to establish the necessary causal link between Redd's quid pro quo

harassment and her discharge.[2] *See Alaniz*, 591 F.3d at 772 ("To establish a Title VII quid pro quo claim, a plaintiff must show that the acceptance or rejection of a supervisor's alleged sexual harassment *resulted in* a tangible employment action." (emphasis added) (internal quotations omitted)); *see also Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir.2000) ("If the employee cannot show such a nexus [between the plaintiff's rejection of the harasser's advances and the tangible employment action suffered], then his employer is not vicariously liable under Title VII for sexual harassment by a supervisor....").

Higgins concedes that Redd did not directly cause her discharge, as she admits that Human Resources Manager David Duford "actually decided" to fire her. Higgins urges, however, that the district court erred in not applying "cat's paw" analysis to find that, although Duford ultimately made the decision to fire Higgins, his decision was influenced by Redd. This Court recently explained the basic premise of the "cat's paw" doctrine:

> Plaintiffs use a cat's paw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any [discriminatory or] retaliatory animus. Under this theory, a plaintiff must establish that the person with a [discriminatory or] retaliatory motive somehow influenced the decisionmaker to take the [tangible employment] action. Put another way, a plaintiff must show that the person with retaliatory [or discriminatory] animus used the decisionmaker to bring about the intended ... action.

*Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir.2015).

Simply put, the cat's paw theory of liability is inapplicable here. Higgins offers no evidence that Redd influenced Duford's decision to fire her. Instead, Higgins offers evidence only that Redd convinced Safety Supervisor Quick to request that Higgins be drug tested. Duford's decision to fire Higgins was, however, based on Higgins's refusal to submit to the requested drug test, since her refusal was in violation of company policy. Higgins herself was responsible for her refusal to take the drug test, and she does not dispute that, had she taken the drug test when first asked, she would not have been fired.

Furthermore, Higgins offers no evidence suggesting that, after she refused to take a drug test, Redd had any influence in discussions regarding the ultimate fate of her employment. This Court has, under broadly similar circumstances, refused to apply the cat's paw doctrine for quid pro quo claims. *See Giddens v. Cmty. Educ. Ctrs., Inc.*, 540 Fed.Appx. 381, 388 (5th Cir.2013) (holding that a quid pro quo plaintiff could not succeed under the cat's paw doctrine where she did not "demonstrate that [the harasser's] acts proximately caused her termination," and reasoning that the plaintiff failed to create a genuine issue of fact regarding causation because an independent investigation showed that the plaintiff violated multiple employee policies); *see also id.* (noting that the investigation's conclusion did not rely on any information or opinions from the harasser).

In sum, Higgins has failed to create a genuine issue of material fact regarding whether Redd's quid pro quo motives caused her discharge. Accordingly, the district court's grant of summary judg-

---

**2.** At oral argument, Higgins conceded that her partial-shift suspension on April 5th was not, in itself, a "tangible employment action."

Thus, this Court looks only at whether Redd's improper motives influenced Lufkin's decision to fire Higgins.

ment against Higgins's quid pro quo claim is affirmed.

## B.

Higgins also challenges the district court's grant of summary judgment against her Title VII retaliation claim on the grounds that she failed to create a genuine issue of material fact regarding pretext. Higgins asserts she was fired in retaliation for complaining about Redd's inappropriate conduct, and that Lufkin's stated reason for firing Higgins—i.e., her refusal to take a reasonable suspicion drug test—was merely a pretext.

To establish a prima facie case of retaliation, a plaintiff must show that (1) she "engaged in activity protected by Title VII; (2) the employer took adverse action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Thomas v. Tex. Dep't of Criminal Justice,* 220 F.3d 389, 394 (5th Cir.2000) (citing *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 705 (5th Cir.1997)). Once a plaintiff establishes a prima facie case, the employer may nonetheless avoid liability by providing a "legitimate, non-retaliatory reason" for the employment action. *Septimus v. Univ. of Houston,* 399 F.3d 601, 607 (5th Cir.2005). If the employer does so, then the burden shifts back to the plaintiff to show that the employer's permissible reason is actually a pretext for retaliation. *Id.* In contrast to the minimal burden that a plaintiff bears when establishing her prima facie case, a plaintiff must provide "substantial evidence" of pretext. *See Auguster v. Vermilion Parish*

*Sch. Bd.,* 249 F.3d 400, 402–03 (5th Cir. 2001).

Higgins acknowledges that, under the terms of Lufkin's drug policy, any employee who refuses to consent to a reasonable suspicion drug test is subject to discharge. Higgins asserts, however, that Lufkin management initially told her that she could take the test the following morning instead.[3] Higgins thus argues that she was, in effect, excused from the drug policy's immediate testing requirement, and that Lufkin's later reliance on the drug policy as the reason for her discharge is pretextual.

■ These facts do not allow for an inference of pretext. Higgins has offered no evidence regarding inconsistent application of Lufkin's drug policy; there is no indication that other Lufkin employees who refused to take a drug test were not also discharged. At best, Higgins offers evidence that Lufkin management initially considered treating Higgins more favorably than required under the terms of the drug policy, but eventually decided to enforce the policy against her. This, without more, is insufficient to establish that Lufkin's stated reason for firing Higgins was pretextual. *See Sanders v. Sailormen, Inc.,* 506 Fed.Appx. 303, 305 (5th Cir.2013) (finding that the plaintiff failed to show evidence of pretext, in part because "[the defendant-employer's] return-to-work agreement expressly reserved the company's discretion to refuse to rehire [the plaintiff] at its option. [The plaintiff] has provided no evidence that [the defendant] did not avail itself of this discretion in other cases, as it did with him").

---

**3.** Higgins also argues that, because the policy does not specify *when* an employee must submit to the drug test, she complied with the policy by agreeing to submit to a drug test the following morning. The policy clearly states, however, that any employee who refuses to provide "a sample for testing ... will be subject to *immediate* termination without further notice or cause." (emphasis added).

### C.

Finally, Higgins argues that the district court erred in granting summary judgment against her hostile work environment claim under Title VII. "A hostile work environment claim consists of five elements: (1) the plaintiff belongs to a protected group; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment affected a term, condition, or privilege of her employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir.2004) (citing *Jones v. Flagship Int'l*, 793 F.2d 714, 719–20 (5th Cir.1986)). At issue specifically is whether Higgins offered evidence showing that Redd's harassment "affected a term, condition, or privilege" of her employment. Harassing conduct affects a "term, condition, or privilege of employment" only if it is either "severe" or "pervasive." *See Royal v. CCC & R Tres Arboles, LLC*, 736 F.3d 396, 403 (5th Cir.2013).

■ Higgins alleges that Redd made inappropriate comments to her on only two occasions—once in January 2012 and once in March 2012—during the one-year period that she worked for Lufkin. Such infrequent conduct is not "pervasive" enough to sustain a hostile work environment claim. *See Shepherd v. Comptroller of Public Accounts of the State of Tex.*, 168 F.3d 871, 875 (5th Cir.1999) (finding that four instances of inappropriate sexual remarks and several more instances of inappropriate touching that occurred over a two-year period did not create a genuine

issue of fact regarding whether the alleged harassment was pervasive).[4]

Alternatively, Redd's harassing conduct, although wholly inappropriate, was not "severe" enough to support Higgins's hostile work environment claim. Isolated incidents do not support a hostile work environment claim unless the complained-of incident is "extremely serious" in nature. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (stating that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (internal citations and quotations omitted)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (stating that the " 'mere utterance of an . . . epithet which engenders offensive feelings in an employee[ ]' does not sufficiently affect the conditions of employment to implicate Title VII" (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986))).

### IV.

For the foregoing reasons, the district court did not err in granting summary judgment against Higgins's Title VII claims. Accordingly, the district court's grant of summary judgment is

AFFIRMED.

---

**4.** This Court has elsewhere stated that the *Shepherd* court erred in its analysis, since the *Shepherd* court incorrectly required that a plaintiff show that the harasser's conduct was both pervasive *and* severe. *See Royal*, 736 F.3d at 402–03. *But see id.* at 403 (conceding that the "specified comments [in *Shepherd* ] were spread out over a period lasting more than a year, obviously diluting their pervasive characteristic").