# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

17-20293
Summary Calendar

United States Court of Appeals
Fifth Circuit
**FILED**
January 18, 2018

Lyle W. Cayce
Clerk

WILBERT PETE,

       Plaintiff – Appellant

v.

CITY OF HOUSTON,

       Defendant – Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-2600

Before HIGGINBOTHAM, JONES, and SMITH, Circuit Judges.

PER CURIAM:*

Sergeant Wilbert Pete ("Pete"), a Houston police officer, sued the City of Houston (the "City") for unlawful retaliation under Title VII and 42 U.S.C. § 1981.[1] The district court granted summary judgment in favor of the City, holding that Pete failed to state a prima facie case for his Title VII claim and failed to properly plead his § 1981 claim. Pete appealed, challenging the district

---

* Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Pete asserted an additional claim under section 21.110 of the Texas Labor Code. The district court granted summary judgment in favor of the City, finding that Pete's claim was time-barred. Pete does not challenge that ruling.

No. 17-20293

court's grant of summary judgment and denial of leave to file an amended complaint. We affirm.

I.

In 1983, Pete began work for the Houston Police Department, ("HPD"). He was promoted to the rank of sergeant in 1998, where he remained until his termination on October 15, 2009. The facts surrounding Pete's termination began one year earlier on October 15, 2008. At that time, Pete observed his direct supervisor, Lieutenant Frank Ross, assign a vacant shift to a white officer without engaging in a polling process.[2] Pete raised this incident with the Employee Representative Council ("ERC"), noting that reassigning vacancies without polling may "raise[] racial tension."

In January 2009, after investigating Pete's complaint, the ERC concluded that "a division manager has discretion to make personnel changes to meet the needs of the division." Pete subsequently appealed this decision to the Chief of Police, Harold Hurtt, on February 10, 2009. In his appeal, Pete questioned whether racial motives influenced Lieutenant Ross's decision not to poll the position.

After inquiring about his appeal and learning that the ERC lost his complaint, Pete contacted Officer Mitch Ruffin, President of the African-American Police Officer League ("AAPOL"). Officer Ruffin informed Pete that he would contact Chief Hurtt, and after doing so, Officer Ruffin told Pete that Chief Hurtt advised Executive Assistant Chief Thaler to resolve the issue. Assistant Chief Thaler directed Assistant Chief Dorothy Edwards to review

---

[2] A polling process enables supervisors to assign officers to vacant shifts. Supervisors collect cards from officers who are interested in the open shift and place those cards in order of seniority. The most senior officer who accepts is assigned the vacancy.

2

Pete's Complaint. During the first week of May, Officer Ruffin informed Pete that Assistant Chief Edwards wanted to organize a meeting with him.

On May 4, 2009, Pete met with Assistant Chief Edwards, Captain Bender, Pete's division manager, and Lieutenant Ross, Pete's shift manager. Pete attended the meeting "with the understanding it was to discuss a resolution to [his] ERC Complaint." However, according to Pete, he was "immediately confronted," stating that "Edwards told him that, as a supervisor, he should not have filed an ERC Complaint, she did not agree with the basis of his Complaint, and as far as she was concerned, the matter was closed." According to the City, the meeting discussed Pete's interference with the affairs of other sergeants. Unbeknownst to Pete, on March 31, 2009, Lieutenant Ross had sent an email to Captain Bender that was then forwarded to Assistant Chief Edwards, describing altercations between Pete and other HPD employees, stating that Pete "thrives on complaining about racial tensions and discrimination were none exist," and recommending that Pete be transferred for a "fresh start."

In this meeting, Assistant Chief Edwards gave an order to Pete that he take any issue with another sergeant to Lieutenant Ross before confronting the other sergeant. Lieutenant Ross and Captain Bender confirmed that Assistant Chief Edwards issued that order. Pete, however, denies receiving the order, stating in a subsequent Internal Affairs investigation that "[he did] not remember [Assistant Chief Edwards] ever saying that [he] had to check with [Lieutenant Ross] before [he] made a decision to communicate with another sergeant about personal or work related issues."

On May 20, 2009, Pete, without raising the issue to Lieutenant Ross first, circulated a memo to inform evening shift sergeants that some officers were signing on late. Upon being notified of Pete's memo by Lieutenant Ross

and Captain Bender, Assistant Chief Edwards filed a formal complaint with Internal Affairs, alleging that Pete was insubordinate when he failed to follow her order to bring personnel issues to Lieutenant Ross first.

Internal Affairs assigned Sergeant Stewart to conduct an investigation, and on July 31, 2009, he completed an investigative report that included statements from Lieutenant Ross, Captain Bender, Assistant Chief Edwards, and Pete. In that report, Sergeant Stewart found sufficient evidence that Pete violated HPD's "General Order 200-08 Conduct and Authority, Insubordination."[3] The Internal Affairs report was then sent to the command of the employees involved—Assistant Chief Edwards. To "maintain the integrity of the disciplinary process," Assistant Chief Edwards sent the report to Captain Pando and Assistant Chief Dirden. Captain Pando reviewed the report, and recommended that Pete's misconduct warranted a disciplinary recommendation of Category E, and that Pete may have violated the Department's policy regarding truthfulness.[4] Assistant Chief Dirden agreed with Captain Pando. Next, the Administrative Disciplinary Committee reviewed the report and recommended that Pete be indefinitely suspended for his behavior.

On October 15, 2009, Chief Hurtt held a due process hearing to afford Pete an opportunity to be heard on the events set forth above. Pete offered no

---

[3] Sergeant Stewart forwarded his report to his immediate supervisor, Lieutenant Horton, who reviewed and summarized the report. Lieutenant Horton sent the report and a synopsis to the captain of Internal Affairs, Chief Lampignano. Chief Lampignano then sent the report to the command of the employees involved to complete the disciplinary process.

[4] In his review of the Internal Affairs report, Captain Pando stated that he found it "difficult to believe that Sgt. Pete does not remember an order from A/C Edwards that she describes 'specifically' and 'emphatically,' along with Captain Bender and Lt. Ross who describe the order as 'direct.'" He continued: "The excuse of 'I do not remember' was not an appropriate excuse to avoid being cited for insubordination . . . [and] it should not be allowed to be an excuse for being untruthful in an administrative statement to the Chief of Police."

No. 17-20293

new evidence and reiterated that he did not recall Assistant Chief Edwards's order. After the hearing, Chief Hurtt decided to indefinitely suspend Pete.[5]

On November 9, 2009, Pete filed a formal charge of discriminatory retaliation with the Texas Commission on Human Rights and the Equal Employment Opportunity Commission, ("EEOC"). Pete received his "Notice of Right to Sue Within 90 Days" from the EEOC on July 7, 2014.[6]

Pete timely brought suit on September 9, 2014, alleging discriminatory retaliation under Title VII and § 1981. Following discovery, on March 1, 2016, the City moved for summary judgment on all claims. On June 6, 2016, with summary judgment pending, Pete sought leave to amend his complaint. On March 20, 2017, the district court denied Pete's motion for leave to amend. Shortly thereafter, on March 31, 2017, the district court granted summary judgment in favor of the City. Pete timely appealed.

## II.

We review a grant of summary judgment *de novo*, applying the same standard as the district court.[7] Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment

---

[5] Pete appealed the decision, and a hearing was held on January 27, 2010. On March 24, 2010, the decision was upheld.

[6] On September 19, 2011, Pete filed a second formal charge of retaliation with the Texas Commission on Human Rights and the EEOC regarding the City's designation of his termination as a "dishonorable discharge" in April 2010. To state a claim under Title VII, a plaintiff must file an employment discrimination charge with the EEOC within "three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The district court correctly concluded that Pete filed his second charge more than 300 days after the alleged retaliatory action occurred. On appeal, Pete argues that "it is well established when a retaliation claim grows out of a properly filed employment discrimination charge, as in this case, it is not necessary for a plaintiff to file a second charge." Pete waived this argument by failing to raise it before the district court, and we do not consider it on appeal. *Celanese Corp. v. Martin K. Eby Constr. Co.*, 620 F.3d 529, 531 (5th Cir. 2010).

[7] *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (citing *United States v. Lawrence*, 276 F.3d 193, 195 (5th Cir. 2001)).

5

No. 17-20293

as a matter of law.[8] On summary judgment, a court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor.[9] To survive summary judgment, the non-movant must supply evidence "such that a reasonable jury could return a verdict for the nonmoving party."[10]

We review a denial of leave to amend for abuse of discretion.[11]

### III.

Pete alleges that his termination was retaliatory under Title VII. To state a prima facie case for retaliation, a plaintiff must establish the following: "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action."[12] The district court held that Pete's retaliation claim failed because he did not demonstrate causation. Thus, for the sake of argument, we will assume that Pete has met the first and second requirements of a Title VII retaliation claim, and cabin our analysis to causation. To show causation for a retaliation claim, a plaintiff "'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'"[13]

Beginning with Pete's direct evidence theory, we agree with the district court that Pete's proffered evidence fails to connect his ERC Complaint and his termination. "'Direct evidence is evidence, which, if believed, proves the fact of

---

[8] FED. R. CIV. P. 56(a).

[9] *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 1868 (2014).

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[11] *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 312 (5th Cir. 2002).

[12] *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017).

[13] *Zamora*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)).

6

[retaliation] without inference or presumption.'"[14] "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face."[15] Thus, the inquiry before a district court is whether "the direct evidence, *truly* standing alone, is sufficient to support [a] conclusion that a nexus exists between the protected activity and the adverse employment action."[16]

Pete cited the following statements as direct evidence of retaliation for filing and pursuing his ERC Complaint: (1) Lieutenant Ross's email to Captain Bender, stating that Pete "thrives on complaining about racial tension and discrimination where none exists;" (2) Lieutenant Ross's Internal Affairs statement that Assistant Chief Edwards mentioned Pete's "repeated false claims of racism" during the May 4, 2009 meeting; (3) Lieutenant Ross's statement after Pete's termination that Pete "fashioned himself as some type of activist" and "created racial tension on the shift when none existed in the first place;" (4) Captain Bender's deposition testimony that Pete created "racial strife" by merely talking to Officer Ruffin, the President of AAPOL; and (5) Assistant Chief Edwards's Internal Affairs statement that Pete "creates racial strife and tension when none exists."

The district court properly analyzed and concluded that the above statements are "broad in nature" and describe a "host of acts." Although the statements contain language that may encompass Pete's ERC Complaint— "racial tension," "racial strife," and "racism"—they "lack the indicia of

---

[14] *Portis v. First Nat'l Bank*, 34 F.3d 325, 328–29 (5th Cir. 1994) (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)).

[15] *Id.* at 329.

[16] *Fabela v. Socorro Indep't Sch. Dist.*, 329 F.3d 409, 416 (5th Cir. 2003) (emphasis in original), *overruled on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 330 (5th Cir. 2010).

No. 17-20293

specificity and causation" that we require of direct evidence.[17] These statements require us to infer how the evidence connects the alleged retaliation to Pete's termination.[18] Because direct evidence requires no such step, the district court did not err in concluding that Pete's direct evidence theory fell short.

The district court next held that Pete's circumstantial evidence also failed to demonstrate causation. While we agree with the district court's conclusion, we find its analysis lacking for failing to address Pete's "cat's paw theory of liability" and our recent decision in *Zamora v. City of Houston*.[19] In *Zamora*, we held that a Title VII retaliation plaintiff may establish "but-for" causation under a cat's paw theory of liability if he establishes that "(1) his . . . supervisors, motivated by retaliatory animus, took acts intended to cause an adverse employment action; and (2) those acts were a but-for cause of the adverse employment action."[20]

---

[17] *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 373 (5th Cir. 2006) (finding that a supervisor's statement that he wanted to "get rid of all the blacks" and "fire all the niggers" did not constitute direct evidence); *see also Fabela*, 329 F.3d at 416 (holding that a supervisor's statement describing employee as a "problem" and specifying her "unsubstantiated" EEOC claim as an example constituted direct evidence); *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 402 (5th Cir. 2000) (finding direct evidence when employer testified that he denied employee a raise because employee filed suit).

[18] For example, Lieutenant Ross's statement that Pete "thrives on complaining about racial tension and discrimination where none exists" requires an inference that Lieutenant Ross is referring to Pete's ERC Complaint and advocating for Pete's termination. That statement, however, emerges from an email that references three specific incidents, none of which include Pete's ERC Complaint, and recommends that Pete be transferred. The other statements fare no better because they similarly require us to presume, at a minimum, that the speaker is referring to Pete's ERC Complaint.

[19] 798 F.3d 326, 331 (5th Cir. 2015). The term "cat's paw" derives from the following fable: "a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1, 422 (2011) (finding that an employer may be liable under cat's paw causation in the context of the Uniformed Services Employment and Reemployment Rights Act).

[20] *Zamora*, 798 F.3d at 333.

Pete contends that his supervisors, like those in *Zamora*, "managed, with their retaliatory statements against him, to turn an investigation of purported wrongdoing by them into a recommendation that he be disciplined." He continues, specifying "'but-for' Ross' and Bender's retaliatory animus, there would not have been a meeting on May 4, there would not have been a complaint filed against [him], there would not have been any recommendation to terminate his employment." Although Pete does not specify what evidence he relies on to demonstrate Lieutenant Ross's and Captain Bender's retaliatory animus, we assume Pete is referring to the statements that he proffered under his direct evidence theory. In any event, we find that the record, even when viewed in the light most favorable to Pete, fails to meet the two requirements of *Zamora*.

Pete must first establish that Lieutenant Ross and Captain Bender, motivated by retaliatory animus, took acts that *intended* Pete's termination. Intent "denote[s] that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."[21] The record does not merit a finding that Lieutenant Ross and Captain Bender *intended* Pete's termination. To the contrary, Lieutenant Ross's email to Captain Bender shows a "desire" to transfer Pete, not terminate him. Furthermore, in light of Pete's misconduct, it would be implausible to conclude that Lieutenant Ross and Captain Bender were "substantially certain" that they would cause Pete's termination.

This brings us to the heart of Pete's appeal, and the second prong of *Zamora*: whether Pete's supervisors' alleged retaliatory animus was a "but for" cause of his termination. To answer that question, we find *Fisher v. Lufkin*

---

[21] *Staub*, 562 U.S. at 422 n.3.

*Industries, Inc.* instructive.[22] In that case, an employee refused to cooperate in a retaliatory investigation, and the district court concluded that such refusal "broke the causal chain" between any alleged retaliatory animus and the adverse employment action.[23] In reversing the district court, we turned to the traditional tort-law principles of proximate cause and superseding cause.[24] Proximate cause, we said, "requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'"[25] Separately, "[a] cause can be thought 'superseding' only if it is a cause of independent origin that was not foreseeable."[26] Applying those principles to the facts in *Fisher*, we determined that the employee's "lack of cooperation" with a retaliatory investigation "was inextricably tied to his co-worker's and supervisor's retaliatory animus."[27] Additionally, the employee's refusal to cooperate in a retaliatory investigation was "entirely foreseeable" and not a superseding cause.[28]

In light of our reasoning in *Fisher*, we find that Pete's misconduct severed the causal chain between any alleged retaliatory animus and his termination.[29] Pete's misconduct was not "inextricably tied" with any alleged retaliatory animus. More fundamentally, Lieutenant Ross and Captain Bender

---

[22] 847 F.3d at 759–60.

[23] *Id.* at 759.

[24] *Id.*

[25] *Id.* (quoting *Staub*, 562 U.S. at 419).

[26] *Id.* (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)).

[27] *Id.*

[28] *Id.*

[29] *See Zamora*, 798 F.3d at 334 (explaining that "an investigation that 'result[ed] in an adverse action for reasons unrelated to the [supervisors'] original biased action[s]'" could break the causal chain) (quoting *Staub*, 562 U.S. at 421); *see also Higgins v. Lufkin Indus., Inc.*, 633 F. App'x 229, 233 (5th Cir. 2015) (holding cat's paw theory inapplicable when decision was based on employee's refusal to take a drug test, even if the decision maker was convinced by employee's supervisor to request a drug test).

could not have foreseen that Pete would violate a direct order from Assistant Chief Edwards. Stated differently, and in light of Pete's failure to produce sufficient summary evidence to the contrary, the adverse employment action would not have occurred "but for" Pete's misconduct. The district court therefore did not err in granting summary judgment in favor of the City.[30]

IV.

Pete also challenges the district court's denial of his request for leave to amend his complaint. We review the district court's denial of this request for abuse of discretion.[31] Although Rule 15(a) carries a presumption in favor of granting parties leave to amend, "[l]eave to amend is in no way automatic."[32]

Here, after almost two years from initiating his lawsuit and with summary judgment pending, Pete requested leave mainly to clarify that he intended to bring his § 1981 claim under 42 U.S.C. § 1983. In granting summary judgment in favor of the City, the district court addressed, and properly rejected, Pete's § 1981 claim as if the claim had been properly plead under § 1983. The district court therefore did not abuse its discretion by refusing Pete the opportunity to amend his complaint.

---

[30] Pete also argues that causation should be inferred "with nothing more than proof that the employer knew about the protected activity, along with a temporal relationship between that knowledge and the adverse consequences." "The cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Ajo v. Bed Bath and Beyond, Inc.*, 265 F. App'x 258, 265 (5th Cir. 2008) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing cases where a three- or four-month period was insufficient to show causal connection)). The district court correctly concluded that a one-year gap fails to establish a causal link.

[31] *See McKinney*, 309 F.3d at 312.

[32] *Marucci Sports, L.L.C. v. Nat'l Collegiate Ath. Ass'n*, 751 F.3d 368, 378 (5th Cir. 2003).

No. 17-20293

## V.

For the above reasons, we AFFIRM the district court's grant of summary judgment in favor of the City of Houston and the district court's denial of Pete's Motion for Leave to File an Amended Complaint.